ROBERT C. SCHUBERT (S.B.N. 62684)
WILLEM F. JONCKHEER (S.B.N. 178748)
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone:   (415) 788-4220
Facsimile:   (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law

*Counsel for Plaintiff*

*[Additional Counsel Appear on Signature Page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| KRISTOPHER GORDON,<br><br>       Plaintiff,<br><br>v.<br><br>HALLE J. BENETT; JONAH SCHNEL; JEFFREY KARISH; ROBERT SZNEWAJS; ERIC HOLOMAN; CHAD BROWNSTEIN; STEVEN A. SUGARMAN; RICHARD LASHLEY; DOUGLAS BOWERS; AND JOHN GROSVENOR,<br><br>       Defendants,<br><br>-and-<br><br>BANC OF CALIFORNIA, INC.,<br><br>       Nominal Defendant. | **No.** 8:19-cv-621<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><u>Jury Trial Demanded</u> |

Plaintiff Kristopher Gordon ("Plaintiff") brings this shareholder derivative action on behalf of nominal defendant Banc of California, Inc. ("Banc" or the "Company"), a Maryland corporation. Plaintiff's allegations are based upon personal knowledge as to Plaintiff and on information and belief as to all other matters. Plaintiff's information and belief is based upon the investigation conducted by and under the supervision of counsel which included, among other things, consultation with an accounting expert and a review and analysis of: (a) the Banc's public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) articles in the news media and analyst reports; (c) the Company's website and press releases; (d) complaints and related materials in litigation commenced against the Company by shareholders and former employees; and (e) applicable rules and regulations.

## NATURE OF THE ACTION

1.      Banc is a financial institution serving clients in California and the Western United States. On October 18, 2016, a post on *SeekingAlpha* by "Aurelius" entitled "BANC: Extensive Ties to Notorious Fraudster Jason Galanis Make Shares Un-Investible" alleged a web of improper and dangerous relationships between Jason Galanis ("Galanis"), a Los Angeles financier and convicted fraudster, and Banc's senior managers, including Defendant Steven Sugarman ("Sugarman"), then Banc's CEO, and Defendant Chad Brownstein ("Brownstein"), then Banc's Lead Independent Director (the "Aurelius Blog").

2.      Banc publicly responded to the Aurelius Blog the same day, stating in a press release that it was already aware of the Galanis allegations, but that Banc's Board, acting through "disinterested directors," had conducted an "independent" investigation of the matter "led by Winston & Strawn," an outside law firm, and had received "regular reports" on the progress of the investigation. Banc's press release went on to discredit the allegations in the Aurelius Blog and denied the existence of ties between Galanis and Banc.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

3.     On October 19, 2016, these denials were repeated and reinforced by Banc's General Counsel, Defendant John Grosvenor ("Grosvenor"), in an investor conference call, in which he stated that, after becoming aware of the issue in 2015, "the Board, acting through its Disinterested Directors, immediately initiated a thorough independent investigation" of the Galanis allegations, and that the Board had received "regular reports" from Winston & Strawn during its review. In addition, the October 18, 2016 press release was attached to a Form 8-K filed by Banc with the SEC on October 19, 2016, signed by Grosvenor.

4.     These disclosures revealed that the Galanis allegations had been known to Banc, but hidden from shareholders, for approximately one year. On or about October 27, 2016, Banc received an inquiry from its auditor, KPMG, raising questions about the potential involvement of Galanis in Banc's finances and operations, and the Company's response to the allegations in the Aurelius Blog. Around that time, the Board created a purported Special Committee to investigate the alleged improper relationships and transactions.

5.     The Special Committee included at least four board members who were themselves mentioned in the Aurelius Blog as having undisclosed conflicts of interest or other questionable associations.

6.     On January 23, 2017, Banc reported the Special Committee's conclusion that the Galanis allegations as they related to Banc were not true. However, the Special Committee also reported that the October 18, 2016 press release acknowledging the Board's awareness of the Galanis allegations and its investigation of them "contained inaccurate statements."

7.     Specifically, the Special Committee revealed that, contrary to that release, Winston & Strawn's earlier investigation was not directed by "disinterested" board members, but by "management," that Winston & Strawn was not "independent," having previously represented Banc and Sugarman, and that the Board had not received "regular reports" of the investigation at all.

8.  Banc also disclosed that its phony October 18, 2016 response to Aurelius Blog post had triggered an SEC subpoena. An SEC investigation was also commenced, captioned *In the Matter of Banc of California NY-09592*, which remains ongoing two years later. Sugarman promptly left the Company.

9.  Banc's officers and directors have breached their duties to the Company in connection with the unfolding scandal at Banc. These officers and directors authorized, endorsed, and/or failed to correct the Company's false October 18, 2016 press release and October 19, 2016 statements issued by and on behalf of the Board.

10.  In addition, Banc admitted in its Form 10-K for 2016, filed on March 1, 2017, that it suffered from material weaknesses of its internal controls in 2016, including an inappropriate "tone at the top," which weaknesses were, at all relevant times, the direct responsibility of management and the Board.

11.  Furthermore, by order dated September 6, 2017, U.S. District Judge Andrew J. Guilford of this Court sustained allegations that purchasers of Banc stock were defrauded by Banc's failure to disclose the alleged Galanis relationships in the Company's 2016 Proxy Statement. *See In re Banc of California Securities Litigation*, SACV-17-00118 AG, Docket 68. According to the Court, the securities plaintiff's allegations raised an inference that, in failing to disclose these alleged relationships to investors, Sugarman and the Company acted with scienter, or intent to defraud investors.

12.  These actions have severely damaged Banc. After the Aurelius Blog posting, Banc plunged into chaos as a direct result of Defendants' misconduct, including the active SEC investigation they precipitated, and the securities fraud litigation. In addition, Banc was subjected to multiple lawsuits by former top executives. These executives allege that Banc's Board suffered from rampant conflicts of interest, and that Banc manipulated its accounting and issued false financial statements for 2016 and 2017 to prop up its results.

---

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

13.     On July 3, 2018, Plaintiff made a demand on the Board to investigate these matters, and to take action to enforce the Company's claims against the wrongdoers (the "Demand"), attached hereto as Exhibit A.

14.     The Demand was refused by letter dated January 4, 2019 written by Defendant Robert Sznewajs ("Sznewajs"), Chairman of the Board, and  himself a target of the allegations raised in the Demand (the "Refusal Letter"), attached hereto as Exhibit B. In that letter, Sznewajs wrote that an "Ad Hoc" Committee of 3 directors (of the 9 member Board) had prepared a written report recommending to the Board that no claims be pursued. According to the Refusal Letter, the Board then "adopted" the "Ad Hoc" Committee's recommendations about a week later.

15.     By letter dated January 24, 2019, Plaintiff requested that the Board provide Plaintiff with the "Ad Hoc" Committee's purported written report, and other supporting documentation, to substantiate the bases for the Refusal Letter (the "Supplemental Demand"), attached hereto as Exhibit C. On February 1, 2019, in a one-sentence letter, Defendant Sznewajs stated that the Board would not share the report or any other materials with Plaintiff (the "Supplemental Refusal Letter"), attached hereto as Exhibit D.

16.     The Board's decision to refuse Plaintiff's demand was wrongful, and the Board's refusal to share its report and supporting documentation with Plaintiff strongly supports Plaintiff's wrongful refusal allegations.

17.     The Board's investigation was neither reasonable nor performed in good faith. The Board's review process was structurally flawed from the outset. The "Ad Hoc" Committee appointed to investigate Plaintiff's demand provided its report and "recommendations" to the full Board, which had the authority to vote on the proposed course of action. The Board retained this authority, even though a majority of the Board members who voted (5 of 9) were implicated in the alleged wrongdoing set forth in the Demand. Then, the Board refused to share the written report with Plaintiff without providing any justification, hiding its work and

1    evidence from Plaintiff, and raising a strong inference that the "Ad Hoc"

2    Committee's investigation was indefensible.

3        18.    Indeed, the Refusal Letter is rife with generalities and conclusory

4    statements. For example, the Refusal Letter states that the "Ad Hoc" Committee

5    interviewed "multiple" witnesses, reviewed "multiple" documents and SEC

6    filings, and reviewed witness deposition transcripts from other proceedings, but

7    fails to identify any of these sources of information with particularity. The Demand

8    Refusal letter repeatedly states that the "Ad Hoc" Committee "discovered no

9    evidence" of wrongdoing, while failing to describe any of the evidence. It failed to

10   analyze claims on a person-by-person, individual basis, and failed to account for

11   the disastrous SEC investigation or the securities class action litigation.

12       19.    The Demand Refusal further conceded that the "Ad Hoc" Committee

13   failed to consider the value of claims the Company might have against Sugarman,

14   based on the terms of a separation agreement executed between Banc and

15   Sugarman upon Sugarman's departure from Banc, which purportedly released him

16   from all claims. In the Supplemental Demand Letter, Plaintiff requested documents

17   to support this analysis, but the Board refused to provide them.

18       20.    Furthermore, as alleged herein, the Demand Refusal fails to even

19   respond to many of the specific issues raised in the Demand Letter.

20       21.    The Board's flawed process and lack of diligence described herein

21   supports the reasonable inference that its investigation was not the product of an

22   independent review, that it was unreasonable, and that its decision-making process

23   was not undertaken in good faith. As a result, notwithstanding Banc's exposure to

24   an ongoing SEC investigation and potentially massive securities class action

25   liability, no fiduciary is being held to account.

26       22.    Accordingly, Plaintiff's demand was wrongfully refused and this

27   action – which seeks to recoup the losses that Banc has sustained, and will continue

28   sustaining, in connection with the Galanis scandal – must now proceed.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

23.     Banc's shareholders have been denied the benefits of loyal management by its executives and directors. As described more fully below, Banc and its shareholders are entitled to monetary and injunctive relief to redress the defendants' bad faith conduct.

## JURISDICTION AND VENUE

24.     Banc is a corporation that conducts business and maintains its executive headquarters in this District. The Individual Defendants have sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

25.     Jurisdiction is based on 28 U.S.C. § 1332(a)(2), there being diversity of citizenship between Plaintiff and Defendants because Plaintiff, on the one hand, and the Defendants, on the other, are citizens of different states. The amount in controversy exceeds $75,000, exclusive of interest and costs.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) and (d). Further, a substantial portion of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

## THE PARTIES

27.     Plaintiff Kristopher Gordon has held shares of Banc stock since September 2016 and is a current Banc shareholder. Plaintiff is a citizen of Georgia.

28.     Nominal Defendant Banc is a Maryland corporation with its principal executive offices located at 3 MacArthur Place, Santa Ana, California 92707. Banc common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BANC." Banc is a citizen of California.

29.     Defendant Halle J. Benett ("Benett") has been a director of Banc since December 2013. Defendant Benett serves on Banc's Audit Committee and Nominating and Corporate Governance Committee. For 2016, Benett received $230,033 in fees, stock awards, and compensation from the Company. For 2017,

Benett received $248,224 in fees, stock awards, and compensation from the Company. Benett is a citizen of California.

30.     Defendant Jonah F. Schnel ("Schnel") has been a director of the Company since 2013. Defendant Schnel is a member of the Nominating and Governance Committee. For 2016, Schnel received $333,650 in fees, stock awards, and compensation from the Company. For 2017, Schnel received $247,633 in fees, stock awards, and compensation from the Company. Schnel is a citizen of California.

31.     Defendant Jeffrey Karish ("Karish") was a director of the Company from 2011 to 2018. Defendant Karish served on Banc's Audit Committee and the Compensation Committee. For 2016, Karish received $214,528 in fees, stock awards, and compensation from the Company. For 2017, Karish received $241,894 in fees, stock awards, and compensation from the Company. Karish is a citizen of California.

32.     Defendant Sznewajs was appointed as Chair of the Board of Directors in January 2017 after having served as a director since 2013. Defendant Sznewajs serves as a Board designated "financial expert" and is a member of Banc's Audit Committee and Compensation Committee. For 2016, Sznewajs received $257,419 in fees, stock awards, and compensation from the Company. For 2017, Sznewajs received $321,641 in fees, stock awards, and compensation from the Company. Sznewajs is a citizen of California.

33.     Defendant Sugarman served as the Company's CEO from 2012 until January 2017 and as a director from 2010 until January 2017. For 2016, Sugarman received $10,050,032 in salary and other compensation from the Company. Sugarman is a citizen of California.

34.     Defendant Eric Holoman ("Holoman") served as a director of the Company from July 2013 until June 2017. Holoman served on the Compensation

Committee of the Board. For 2016, Holoman received $257,419 in fees, stock awards, and compensation from the Company. Holoman is a citizen of California.

35. Defendant Brownstein served as a director of the Company from May 2011 until February 2017. Brownstein served on the Compensation Committee of the Board. For 2016, Brownstein received $372,641 in fees, stock awards, and compensation from the Company. Brownstein is a citizen of California.

36. Defendant Richard J. Lashley ("Lashley") has been a director of the Company since February 16, 2017. Defendant Lashley is, and at all relevant times has been, a member of the Audit Committee and the Nominating and Corporate Governance Committee. Lashley is co-founder of PL Capital Advisors, which owned 3,427,219 shares of Banc's common stock as of 2017. For 2017, Lashley received $192,937 in fees, stock awards, and compensation from the Company. Lashley is a citizen of California.

37. Defendant Douglas H. Bowers ("Bowers") has been the CEO and a director of the Company since May 2017. For 2017, Bowers received $2,680,500 in salary and other compensation from the Company. Bowers is a citizen of California.

38. Defendant Grosvenor was Banc's General Counsel and Corporate Secretary from 2012 until 2018. For 2016, Grosvenor received $1,100,046 in total compensation from the Company. Grosvenor is a citizen of California.

39. The Defendants identified in paragraphs 29-38 are sometimes collectively referred to herein as the as the "Individual Defendants."

**BOARD AND OFFICER DUTIES**

**Duties of the Individual Defendants**

40. Under Maryland law, each Individual Defendant owed and owes Banc and its shareholders fiduciary obligations and due care. Each Individual Defendant was and is required to act in good faith, in a manner the director reasonably believes to be in the best interests of the corporation, and with the care that an ordinarily

prudent person in a like position would use under similar circumstances. Maryland law defines "act" to include an act, an omission, a failure to act, or a determination made not to act.

41.     To discharge their duties, Banc's officers and directors were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Banc were required to ensure the Company complied with its legal obligations and requirements, including complying with regulatory requirements by devising and implementing a system of internal controls sufficient to ensure the accuracy of Banc's financial statements and reporting

42.     Banc's officers and directors were required to remain informed as to how Banc conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices as necessary to comply with applicable laws.

43.     At relevant times, Defendants Benett, Karish, Sznewajs, and Lashley served as Audit Committee members, with Lashley as Chairman. The Audit Committee is responsible for monitoring and oversight of the integrity of the Company's financial statements and financial accounting practices, the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, the effectiveness of the Company's internal controls over financial reporting, and the Company's compliance with legal and regulatory requirements.

## RELEVANT FACTUAL ALLEGATIONS

### A.     Background.

44.     In 2010, Banc's predecessor entity, First PacTrust, was struggling in the post-recession economy. COR Capital LLC ("COR") stepped forward and

1   helped contribute $60 million to revitalize the bank. COR was owned and managed
2   by Sugarman, who joined First PacTrust's Board of Directors.  On September 21,
3   2012, Sugarman became First PacTrust's CEO.

4        45.    In July 2013, First PacTrust renamed itself Banc of California and
5   promoted itself as a "community investment leader." Banc experienced
6   phenomenal growth since 2010 as its assets grew to more than $10 billion.

7        46.    As of April 15, 2016, the Banc's Board consisted of seven (7)
8   directors: Defendants Schnel, Benett, Sznewajs, Karish, Sugarman, Brownstein,
9   and Holoman.

10        47.    On that date, Banc filed its 2016 Proxy Statement with the SEC,
11   which was signed by Sugarman. Banc was using the Proxy to solicit proxies from
12   shareholders for use at Banc's annual meeting. Among the items up for vote at the
13   meeting was the re-election of Sugarman as Banc director.

14        48.    The 2016 Proxy Statement contained a biography of Sugarman. This
15   biography described his involvement with COR, in relevant part as follows:

> Mr. Sugarman is the Chair, President and Chief Executive
> Officer of the Company. Mr. Sugarman has served as a director
> of the Company and the Bank since November 2010, Chief
> Executive Officer of the Company since September 2012 (and
> for a month prior, acted as co-Chief Executive Officer of the
> Company) and President of the Company and President and
> Chief Executive Officer of the Bank since November 2013.
> Mr. Sugarman continues as the Chief Executive Officer and
> director of COR Securities Holdings Inc., the parent company
> of COR Clearing LLC (of which he is Chair of the Board), a
> national securities clearing firm, and remains the Managing
> Member of COR Capital LLC, a Southern California-based
> firm that was a lead investor in the November 2010
> recapitalization of the Company.

          * * *

49.     Banc's 2016 Proxy Statement included a statement that the Company's Nomination and Corporate Governance Committee had conducted its annual review of "all relationships between the Company and each Director and Nominee and has affirmatively determined that, with the exception of Mr. Sugarman, who is a Company employee, each non-employee director . . . has only immaterial relationships with the Company, and accordingly each has been determined to be independent under these standards."

50.     According to the 2016 Proxy Statement, the Board also concluded that all members of the Audit Committee and Nominating and Corporate Governance Committee were independent, as that term is defined by listing standards and the Company's Corporate Governance Guidelines.

51.     In reality, a tangled web of related party transactions and undisclosed financial relationships would embroil Banc in a controversy that continues to threaten the Company.

**B.     The Aurelius Blog.**

52.     On October 18, 2016, *SeekingAlpha*.com published the Aurelius Blog entitled "BANC: Extensive Ties To Notorious Fraudster Jason Galanis Make Shares Un-Investable," written by an anonymous blogger known as Aurelius. It claimed, among other things, that Banc directors Sugarman and Brownstein, along with top executive Seabold, had certain ties to Galanis. Galanis was a convicted felon with a reputation for looting public companies.

53.     The Aurelius Blog described Galanis's history of criminal conduct and provided links to source documents that included SEC complaints and criminal indictments. Specifically, the Aurelius Blog alleged how, on September 24, 2015, the United States Department of Justice ("DOJ") and the SEC charged Galanis with orchestrating multiple schemes to defraud investors.

54.     The Aurelius Blog alleged how, from 2009 to 2011, Galanis and others engaged in a scheme to defraud the shareholders of a publicly-traded

company called Gerova Financial Group, Ltd. ("Gerova") by obtaining secret control over millions of shares of stock and then manipulating the market for the stock as the defendants caused their secretly held shares to be sold.

55.     As part of the scheme, Galanis fraudulently generated demand for Gerova stock by bribing investment advisers to purchase for client accounts the Gerova stock that was sold by Galanis and others, thereby enabling Galanis to cash out from the scheme and make millions in illegal profits.

56.     Galanis pled guilty to these charges in July 2016 and was sentenced to a six-year prison term in February 2017.

57.     In May 2016, while he was out on bail for the Gerova fraud, the DOJ and SEC again charged Galanis with securities fraud, this time in connection with a Ponzi scheme to defraud investors and a Native American tribal entity of tens of millions of dollars ("Tribal Bond Scheme").

58.     Galanis and other co-conspirators allegedly induced a Native American tribal entity to issue bonds based on lies about how the bond proceeds would be invested. Galanis and the others pocketed the proceeds. Galanis also allegedly defrauded investors into buying the bonds by hiding material facts. Galanis pled guilty to the Tribal Bond Scheme in January 2017.

59.     The Aurelius Blog alleged that Sugarman's COR and Galanis controlled the same offshore insurance company, Valor Group ("Valor"), a Bermuda based holding company. Valor and its subsidiaries were central to the Tribal Bond Scheme and were used by Galanis to carry out the fraud. The Aurelius Blog alleged that a specific Valor subsidiary also played a role in the Tribal Bond Scheme, and was part of COR.

60.     In particular, COR entities were also accused of facilitating the Tribal Bond Scheme. Specifically, Wealth-Assurance AG acted as Valor Group's primary insurance subsidiary, and Burnham Financial, which maintained its headquarters in the same building as Banc, served as the placement agent for the

1   bonds.  COR itself was listed by Galanis as a financial sponsor of the fraudulent

2   bonds and references to COR's relationship with Banc appeared on documents

3   used by Galanis to enhance his credibility with investors he was defrauding.

4        61.   Documents obtained by the SEC in its investigation of the Tribal

5   Bond Scheme show that Galanis used his alleged connection with COR to

6   demonstrate his financial backing to perpetrate the fraud. During the Tribal Bond

7   Scheme, Galanis also represented to his co-conspirators that he controlled

8   companies associated with COR, including COR itself.

9        62.   The Aurelius Blog and accompanying documents also suggested that

10  Sugarman held a majority interest in an entity named JAS Partners 1, LLC ("JAS

11  Partners"). JAS Partners, along with Banc executive Seabold, controlled Camden

12  Capital Partners, LLC ("Camden"). According to the Aurelius Blog, Camden was

13  used to finance Galanis during the Tribal Bond Scheme and was also utilized by

14  Galanis during the Gerova securities fraud.

15       63.   In addition, the Aurelius Blog alleged ties between Galanis and

16  Brownstein. In 2011, a private investment firm run by Brownstein was a major

17  investor in Prospect Global Resources, Inc. ("Prospect Global"), an entity which

18  the SEC identified as a company Galanis controlled, and to which he funneled

19  money obtained through his frauds.

20       64.   Banc's Board had become aware in 2015 of certain alleged Galanis

21  relationships with officers and directors at Banc. Defendants Sugarman,

22  Brownstein, Holoman, Sznewajs, Benett, Karish and Schnel were then current

23  directors. However, these matters were not disclosed to shareholders at the time.

24  Banc shares fell $4.61 per share, or 29 percent, the day the Aurelius Blog appeared

25  on *SeekingAlpha*.com.

26     **C.**    **Banc Makes Multiple False Statements About the Aurelius Blog.**

27       65.   In response to the disclosures in the Aurelius Blog, Banc quickly

28  issued a press release trying to contain the fallout. Banc revealed in a press release

---

Verified Amended Shareholder Derivative Complaint

and investor call that the Board had been aware of the allegations for *approximately a year*, but that an investigation did not find them credible.

66.     The press release, issued on October 18, 2016 – just hours after the *Seeking Alpha* blog was published – included the following statements:

> Banc of California, Inc. today announced it is aware of allegations posted in a financial blog. The Company's Board of Directors has been aware of matters relating to Jason Galanis including certain claims he had made suggesting an affiliation with members of the Company, its Board, and/or its Executive team. *The Board, acting through its Disinterested Directors, immediately initiated a thorough independent investigation* led by Winston & Strawn, and has received regular reports including related to regulatory and governmental communications over the past year. [emphasis supplied].

> The complaint filed by the Department of Justice against Mr. Galanis and others dated May 9, 2016. . . clearly states that Mr. Galanis' claims to be affiliated with COR Capital were fraudulent. . . Banc of California and its Disinterested Directors will make further facts publicly available as appropriate.

67.     On October 19, 2016, the Company filed a Form 8-K with the SEC, which attached a copy of the October 18, 2016 press release.

68.     Also on October 19, 2016, the Company held an analyst conference call to discuss its third quarter 2016 financial results. Defendant Grosvenor reaffirmed the statements contained in the Company's press release issued the day before that the Board's "independent" investigation found no evidence that Galanis exercised control over Banc or any of its directors.

69.     Specifically, Grosvenor provided the following description of the Board's role in the prior investigation:

As discussed in our press release yesterday, management first advised the Board of Directors in 2015 regarding the facts then known pertaining to the circumstances associated with Jason Galanis's indictment, including certain claims attributed to Galanis that he was affiliated in some manner with the Company or members of the Company's Board of Directors or management.

In response, *the Board of Directors determined to retain outside counsel to independently investigate the matters raised and report any information* that might indicate the possible existence of any potential impropriety. The results of that investigation, which has continued over the course of more than a year, failed to disclose any ownership interest by Galanis in the Company or the bank, and affirmatively confirmed that he exercised no direct or indirect control over the Company or the bank or any entity owned or affiliated with Steven Sugarman or any other member of the Board of Directors. [emphasis supplied].

The investigation also failed to disclose any past or present lending relationship between Galanis and the bank. In fact, the inquiry disclosed instances in which attempts by Galanis to establish a business relationship with the Company, presumably in furtherance of the fraudulent schemes for which he subsequently pled guilty, were unsuccessful.

In that regard, the Company shared information developed in the course of its own investigation in cooperation with the government's prosecution of Galanis and others. That cooperation is evidenced by, among other matters, Paragraphs 40 and 41 contained in the affidavit submitted by the FBI's special agent in charge of the government's investigation as recited in the letter of Company counsel. As has been made clear, at least by reputable news organizations, none of the Company or the bank or any member of the Board of

Directors or management has been the subject of the government's prosecution of Galanis.

Finally, in response to the allegations contained in the Seeking Alpha post and *at the direction of the disinterested members of the Board*, Company counsel has made written demand, a copy of which is included in our filing this morning, for the immediate removal and a written retraction of the article. In addition, the Company has been advised by its counsel that the demonstrably egregious nature of the defamatory statements constitutes actionable libel per se, and the Company intends to vigorously pursue all of its legal remedies. [emphasis supplied].

As a result, on the advice of counsel and in order to preserve our rights, we are not going to discuss any further specifics about Galanis during today's call while our formal demands for removal and a retraction of the article are pending. We will provide periodic public updates and further information as additional developments occur.

70.     At the time each of these statements describing the Board's purported process and decision-making on the Galanis issues, Defendants Sugarman, Sznewajs, Benett, Schnel, Karish, Holoman and Brownstein were members of the Board.

71.     Given the prominence with which the Company disclosed the alleged findings of the Board, including in a press release, an investor conference call, and a Form 8-K, and that the disclosures describe the Board's knowledge and actions, these directors knew that the October 18, 2016 press release falsely conveyed the true extent and nature of the Board's prior investigation into possible relationships between Galanis and corporate insiders.

72.     Grosvenor, as General Counsel for Banc, likewise knew or recklessly disregarded that the statements about the Board's actions and the "independence" of Winston & Strawn were false, as it had previously represented Banc.

73.     On October 27, 2016, Banc's independent auditor, KPMG, which had not previously been advised of the Winston & Strawn investigation related to Galanis, sent Defendant Sznewajs a letter "raising concerns about allegations of 'inappropriate relationships with third parties' and 'potentially undisclosed related party relationships.'" The Company promptly formed a Special Committee of directors to investigate the allegations raised in the *SeekingAlpha* report.

74.     The Special Committee initially consisted of Defendants Schnel, Karish, Benett, Sznewajs, and Holoman, who left the Special Committee before it concluded its work. Banc represented to investors that each of these directors was "independent" for the purpose of the investigation. However, each director was conflicted from the outset, because, among other things, the Aurelius Blog contained allegations against them as well.

75.     For example, the Aurelius Blog alleged that (a) Defendant Schnel was a partner of Brownstein, and the two had cofounded a company; (b) Defendant Karish was a director at Digital Turbine with an in-law of Sugarman; (c) Defendant Benett was an investment banker with Keefe, Bruyette & Woods ("KBW") which had been "paid millions by BANC as underwriter of securities offerings;" and (d) Defendant Sznewajs was previously the CEO of West Coast Bank, which received a Cease and Desist Order from regulators in 2009 due to "management whose policies and practices are detrimental to the bank."

76.     On November 10, 2016, Banc filed a Form 12b-25 that revealed the formation of the "Special Committee of Independent Directors" on October 27, 2016 to review "certain purported improper relationships and related party transactions and related matters." The press release provided no information about the composition of the committee or relationships that were being reviewed.

77.     Also on November 10, 2016, Banc filed a notice with the SEC stating that it was unable to file its quarterly report because of the Special Committee's ongoing investigation:

> [The Company] is delaying the filing of its Quarterly Report on Form 10-K for the fiscal quarter ended September 30, 2016 . . . at this time to allow for completion of a review into certain purported improper relationships and related party transactions and related matters. The review includes an investigation by independent legal counsel having no prior relationship with the Company or its officers and directors under the direction of a Special Committee of Independent Directors, which was established by the Board of Directors on October 27, 2016.

78.     On December 27, 2016, Banc announced that Defendant Benett would not stand for re-election as a director of the Company at the 2017 shareholder meeting. Benett indicated that his decision not to stand for re-election was for personal reasons, based upon his assessment of the demands of his business activities and employment.

79.     On January 23, 2017, Banc issued a press release disclosing that the Company's October 18, 2016 press release downplaying the Galanis allegations contained statements regarding the Board's conduct that were not true.

80.     In relevant part, the January 23, 2017 press release stated:

> On October 18, 2016, an anonymous blog post raised questions about related party transactions and other issues with respect to the Company. As previously disclosed, in response to these allegations, the Board formed a Special Committee which commenced a process to review the allegations. Shortly thereafter, on October 27, 2016, the Company's independent auditor, KPMG, sent a letter to Mr. Sznewajs in his capacity as Chair of the Company's Joint Audit Committee (the "KPMG Letter") raising

concerns about allegations of "inappropriate relationships with third parties" and "potential undisclosed related party relationships."

On October 30, 2016, the Special Committee retained WilmerHale, a law firm with no prior relationship with the Company, to conduct an independent investigation to address certain issues raised by the blog post, as well as questions raised by the KPMG Letter. In accordance with the KPMG Letter, WilmerHale will make a final report to the Special Committee and KPMG on the results of its investigation. The Special Committee expects that this final report will take place within weeks.

While certain work remains to be completed, to date WilmerHale's inquiry has not found any violation of law. In addition, contrary to the claims in the blog post, the inquiry has not found evidence that Jason Galanis has any direct or indirect control or undue influence over the Company. Furthermore, the inquiry has not found evidence establishing that any loan, related party transaction, or any other circumstance has impaired the independence of any director.

Through the inquiry, however, the Special Committee has determined that a press release issued on October 18, 2016 contained inaccurate statements. *In that press release, the Company stated that the "Board of Directors, acting through its Disinterested Directors" had, as of October 18, 2016, investigated issues raised in the blog post. This press release was inaccurate in certain respects. The review established that although an investigation had been conducted, it was not initiated by the Board of Directors; rather, it appears to have been directed by Company management rather than any subset of independent directors. In addition, the press release characterized the investigation as "independent" without disclosing that the law firm conducting the investigation had previously represented both the Company and the Company's CEO individually. Furthermore, the press release stated that the Board or a group of "Disinterested*

> *Directors" had received "regular reports including related to regulatory and governmental communications." This overstated both the degree to which the Company had been in contact with regulatory agencies about the subject matter referenced in the blog post, as well as the involvement of the directors in oversight or direction of the inquiry.* [emphasis supplied].
>
> Related to this matter, on January 12, 2017, the Securities and Exchange Commission ("SEC") issued a formal order of investigation directed at certain of the issues that the Special Committee is reviewing. Also on January 12, 2017, the SEC issued a subpoena seeking certain documents from the Company, primarily relating to the October 18, 2016 press release and associated public statements. The Company intends to fully cooperate with the SEC; in addition, the Special Committee will share the results of its review with the SEC staff.

81.     In a separate press release issued the same day, Banc announced Sugarman's resignation from all positions with the Company. He was replaced as Chairman by Defendant Sznewajs, and the Company announced a convoluted interim executive structure, as follows:

> The Office of the CEO/President will be composed of Hugh Boyle, Chief Risk Officer, who will additionally assume the title of Interim Chief Executive Officer, and J. Francisco A. Turner, Chief Strategy Officer and Principal Financial Officer. Mr. Turner will partner with Mr. Boyle and assume the title of Interim Chief Financial Officer and President.

82.     On this news, Banc's shares fell $1.50, or nearly 10 percent.

83.     On February 9, 2017, the Company issued a press release announcing that "WilmerHale has made a final report to the Special Committee . . . and has confirmed its earlier conclusion that the inquiry has not found any violation of law." The investigation concluded that Galanis had no indirect or direct control or

undue influence over the Company and that no loans or related party transactions had impaired the independence of any director.

84.     The directors on the Special Committee (including, at least, Schnel, Sznewajs, Benett, Holoman, and Karish) were directly responsible for, and undoubtedly aware of, the contents of the phony October 18, 2016 press release when it was issued. Yet none of the Special Committee members were themselves held accountable for the false statements, nor was Grosvenor, who repeated the falsehoods on the October 19, 2016 investor call, and signed the Form 8-K by which the October 18, 2016 press release was filed with the SEC.

85.     These breaches of disclosure by the members of the Special Committee and Defendant Grosvenor led directly to a subpoena by the SEC.

**D.     The Securities Class Action.**

86.     On January 23, 2017, a securities fraud class action lawsuit was filed in this Court on behalf of purchasers of Banc's securities, based on allegations that Banc, Sugarman, and non-party James J. McKinney made false and misleading statements to investors in connection with the Galanis allegations.

87.     In an amended complaint filed on May 31, 2017, the plaintiff alleged that the defendants (1) omitted material information from their public statements about numerous connections CEO Sugarman and other top Banc executives and directors had with Galanis; (2) misled investors about the independence of Banc's "disinterested directors" in its SEC filings in connection with their approval of related-party transactions, and (3) failed to disclose that Banc's management was conducting an ongoing internal investigation into the Company's ties with Galanis.

88.     In its order denying the motion to dismiss dated September 6, 2017, the Court held that the plaintiff adequately alleged a material omission in the biographical statement describing Sugarman in the 2016 Proxy Statement, as alleged above.

89.     With respect to scienter, or intent to defraud, the Court held:

> The question is then whether Sugarman approving the contents of the 2015 Proxy [filed in 2016], or failing to correct them, raises a strong inference that Sugarman did so with the intent, or at least with deliberate recklessness, to deceive investors. A quick recap of some of the details the Court has already covered makes the answer to that question straightforward. The Court accepts as true, for the sake of these motions to dismiss, Plaintiffs' allegations that there were ties between Sugarman and Galanis and that COR was involved in the Tribal Bond Scheme. It follows from there that it would be "hardly plausible" for Sugarman not to know about those ties. And, as the Court already concluded, Plaintiffs have sufficiently pled that the 2015 Proxy became misleading in light of these facts. The logical conclusion is therefore that Sugarman stayed silent about his and COR's involvement intentionally or at least with deliberate recklessness.

90.     The Court also found probative that "Sugarman resigned on the very same day that Banc issued a statement announcing an SEC investigation" of the Galanis allegations, which supported plaintiff's scienter allegations.

91.     On May 31, 2018, Judge Guilford certified the class, defined as "All persons and entities who purchased or otherwise acquired the common stock of Banc of California, Inc. ("Banc" or the "Company") during the period from April 15, 2016 through January 20, 2017, inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class are Defendants, present or former executive officers and directors of Banc and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii))."

92.     The order certifying the class has exposed the Company to massive liability. A trial is currently scheduled for February 18, 2020.

**E.      The Company Admits Internal Control Deficiencies.**

93.     Notably, in its Form 10-Q filing for the quarter ended September 30, 2016, filed on March 1, 2017, Banc admitted that it suffered from material weaknesses in its internal controls in the wake of the Aurelius Blog scandal. According to the Form 10-Q:

> Based on this evaluation, management concluded that the disclosure controls and procedures were not effective as of September 30, 2016 due to a material weakness in the design and operating effectiveness of our internal control over financial reporting as it relates to our control environment. As defined in SEC Regulation S-X, a material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. We determined that an inadequate tone at the top regarding the importance of internal control over financial reporting gave rise to the material weakness. Specifically, the Company's tone at the top did not appropriately prioritize the Company's internal control over financial reporting which has not been sufficient to address new and evolving sources of potential misstatement largely driven by the increased complexity and growth in the size and scale of the business. This ineffective tone at the top adversely impacted a number of processes resulting in an ineffective risk assessment process, ineffective monitoring activities, and insufficient resources or support which caused the Company to experience an increase in the number of control deficiencies across multiple processes. As a result, even though no material misstatement was identified in the financial statements, it was determined that there was a reasonable possibility that a material misstatement in the Company's financial statements would not have been prevented or detected on a timely basis.

94.     In addition, in its Form 10-K filing for 2016, also filed on March 1, 2017, Banc's auditor stated that Banc suffered from material weaknesses in its

internal controls and from a "number of control deficiencies across multiple processes." According to the auditor, Banc "has not maintained effective internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)."

95.     Banc's lack of controls permitted Defendants to conceal the ties between Galanis and Banc's officers and directors. Banc's subsequent remedial actions demonstrate the abject state of its internal controls in 2016.

96.     To remedy these material weaknesses, Banc announced in 2017 that it was (a) separating the positions of Chairman of the Board and CEO; (b) creating an "Office of the CEO/President" to improve "tone at the top" and place a renewed emphasis on compliance and control; (c) eliminating the lead independent director position; (d) eliminating the Executive Committee and redistributing duties of the Compensation, Nominating and Corporate Governance Committee; (e) tightening the controls on outside business activities by officers, employees, and non-employee directors; and (f) strengthening related party transaction policies.

97.     Each of the Defendants who served as an officer or director during fiscal year 2016 was responsible for the Company's failed internal controls, which contributed directly to the wrongdoing alleged herein, and which gave rise to the SEC investigation, and the securities class action.

**F.     The Manipulation of Bonus Accounting.**

98.     As the Aurelius Blog scandal engulfed Banc, Banc's new management, with approval of the Audit Committee, sought ways to artificially inflate Banc's first quarter 2017 financial results to maintain Banc's credibility in the market. This is alleged in detailed wrongful termination suits filed by two former Banc executives with alleged particularized knowledge regarding the disputed accounting, Jeffrey T. Seabold ("Seabold"), former Executive Vice

President and Chief of Staff, and Heather Endresen ("Endresen"), former Managing Director of SBA, and borne out in Banc's reported earnings.

99.     Seabold alleged that to implement this plan, Banc initiated a so-called "reassessment" for accruals for 2016 bonuses. This resulted in reversing $7.8 million in such accruals, which were then credited toward liabilities accrued in the first quarter of 2017, resulting in increased earnings for the first quarter of 2017. Endresen likewise claimed that as early as January 2017, she was informed that Banc had decided to scale back the Company bonus pool, and consequently, certain employee bonuses would be reduced. She expressed her disagreement to then Audit Committee Chairman Lashley on the justification and validity of the bonus reversal, which shifted over $7 million in earnings from 2016 to 2017.

100.   The improper bonus accounting alleged by Seabold and Endresen is evident in Banc's filed financial statements for the relevant periods. For the three years ended December 31, 2016, Banc's net income had grown by an average of approximately 38% per year. Banc's quarterly net income for the year ended December 31, 2016 averaged approximately $29 million. By comparison, Banc reported net income of just $17.2 million for the quarter ended March 31, 2017, approximately 50% below earnings reported for the fourth quarter of 2016.

101.   Based on disclosures in Banc's March 31, 2017 financial statements, filed with the SEC on May 10, 2017, Banc reversed approximately $7.8 million of accrued incentive compensation that had been recorded as a liability at December 31, 2016, and had been recognized as an expense in Banc's financial statements for the year ended December 31, 2016, recording the reversal as a reduction in first quarter 2017 compensation expense.

102.   Banc's first quarter 2017 Form 10-Q described the reversal as follows: "At December 31, 2016 the Company accrued a liability for estimated discretionary incentive compensation payments to certain employees. The amount paid was less than the accrued liability. Consequently, the Company reversed the

excess accrual and recorded a credit to salaries and employee benefits on the consolidated statements of operations of $7.8 million during the three months ended March 31, 2017. The reversal, based on new information driven by changes to certain facts and circumstances, was determined to be a change in estimate."

103.   The effect of the reversal was to increase Banc's pre-tax earnings for the quarter ended March 31, 2017 by approximately $7.8 million, representing 48% of the Bank's reported pre-tax earnings for the first quarter. The reversal represented approximately 5.2% of the Bank's reported pre-tax income for the year ended December 31, 2016. The reversal had a material effect on Banc's December 31, 2016 and March 31, 2017 financial statements, though the relative effect was far greater on the first quarter 2017 financial statements.[1]

104.   Banc reported earnings per share on a fully diluted basis of $0.23 for the first quarter of 2017. Remarkably, approximately $0.11 of this amount was the direct result of the disputed reversal of the 2016 accrued incentive compensation. In other words, without the disputed reversal of the 2016 accrued incentive compensation, Banc would have reported just $0.12 in earnings per share for the quarter ended March 31, 2017, compared with earnings per share of $0.56 reported for the prior quarter ended December 31, 2016.

105.   The price of Banc's shares had declined significantly beginning in the fourth quarter of 2016 and continuing into 2017. From August 2016 through October 2016 the share price fell from $22 per share to $13 per share.

106.   Significant drops in earnings and share prices provide a strong incentive for management to take drastic actions to improve earnings and share prices, including intentional misapplications of GAAP.

---

[1] Materiality is generally defined based on whether an amount is expected to influence the decisions of users of the financial statements. As a rule of thumb, the quantitative benchmark for publicly held entities generally ranges from 5% to 10% of reported net income.

107.   Expenses must be recognized in the periods in which they are incurred, when the benefits associated with cost have been exhausted.  Liabilities represent likely future payments resulting from past transactions or events. Thus, bonuses to be paid for services rendered by employees to Banc during the year ended December 31, 2016, were required to be recognized in the 2016 financial statements.

108.   The Notes to Banc's financial statements for the year ended December 31, 2016, acknowledge that its financial statement amounts were based on estimates and assumptions based on available information.[2] Accounting estimates are an approximation of an amount included in the historical financial statements as of a certain date. Accounting estimates measure the effects of past transactions or events. In the case of bonus accrual, the past transaction was the service rendered by employees prior to the December 31, 2016 balance sheet date. Estimates must be measured based on the most likely outcome.

109.   Having prepared its financial statements for the year ended December 31, 2016, Banc was required to consider whether subsequent events, including a likely reduction in 2016 bonus amounts, provided additional evidence about conditions existing at the date of the balance sheet, including the estimates inherent in its preparation of the financial statements. For SEC filers, subsequent events must be evaluated through the date that the financial statements are issued.[3]

110.   Because it is a public company, for purposes of evaluating the reasonableness of the estimated accrued incentive compensation recorded in Banc's records as of December 31, 2016, management was required to evaluate and consider all information that was available through March 1, 2017, the date that Banc's 2016 financial statements were filed with the SEC.

111.   If, based on the information available to Banc management on March 1, 2017, management believed it was reasonably possible that some or all of the

_____

[2] Banc 2016 Form 10-K, page 107.

incentive compensation bonuses initially accrued at December 31, 2016 would not be paid, the amounts accrued as of December 31, 2016 should have been adjusted to the amounts reasonably expected to be paid with a corresponding adjustment to the December 31, 2016 financial statements prior to filing the financial statements with the SEC, rather than recognizing the change in the financial statements for the quarter ended March 31, 2017.

112.   During the two month period following December 31, 2016, Banc's Board would have been fully aware of the expected significant decline in first quarter earnings and earnings per share relative to the reported earnings for the quarter ended December 31, 2016, and the continuing decline in the price of Banc's shares. During this same period, Banc was also struggling with the allegations of wrongdoing related to the Aurelius Blog post in October 2016, and the announcement of the SEC investigation in January 2017.

113.   These conditions created a strong incentive to take actions to bolster first quarter 2017 earnings. On or prior to March 1, 2017, two full months after year-end, the Board knew of the likely reduction of any accrued but unpaid 2016 incentive compensation and was required by GAAP to adjust the amount accrued in the December 31, 2016 financial statements to the amount reasonably expected to be paid, based on information available at March 1, 2017.

114.   Banc's actions in reversing the accrued 2016 incentive compensation and recognizing the reversal as an increase in first quarter of 2017 earnings (rather than an increase in year-end 2016 earnings) represented an intentional misstatement of Banc's financial statements for the year ended December 31, 2016 and quarter ended March 31, 2017.

115.   Even Banc's 2017 Proxy Statement, filed on April 27, 2017, admits that certain bonus reductions were made for 2016 "in light of the extraordinary challenges faced by the Company in late 2016 and early 2017" – events which

occurred well before March 1, 2017 when the Form 10-K for 2016 was filed, in which the effect of these reversals should have been disclosed.

116.   Banc's reduction of incentive based compensation for 2016 is further highly dubious in light of the Company's reported performance in 2016, which it described in a January 30, 2017 press release as a "record" year in which Banc "exceeded each of our stated financial targets."

117.   Based on the information available to management and the Board, Banc's fiscal year 2016 financial statements included in its Form 10-K should have been adjusted to reduce the accrued incentive compensation as of December 31, 2016 resulting in an increase in earnings for the fourth quarter of 2016, rather than shifting the income to the first quarter of 2017.

118.   The 2016 Form 10-K was filed on March 1, 2017, and was signed by Defendants Lashley, Benett, Karish, Schnel and Sznewajs. Banc's first quarter 2017 Form 10-Q disclosing these false and misleading financial statements was filed on May 10, 2017, and was signed by Defendant Bowers.

119.   At the time of the Form 10-K filing, the Audit Committee consisted of Defendants Lashley, Benett, Karish and Sznewajs. At the time of the Form 10-Q filing, Defendant Bowers was serving as CEO and a director.

120.   Given the materiality and impact of the wrongful accrual accounting on reported results for fiscal year 2016 and the first quarter of fiscal year 2017, each of these Defendants and Schnel knew or recklessly disregarded the false and misleading nature thereof.

**DAMAGES TO THE COMPANY**

121.   Banc has suffered, and continues to suffer, from the Individual Defendants' wrongdoing described herein.

122.   Banc hid the Galanis allegations from shareholders for approximately a year. When confronted with the Aurelius Blog, Banc then disseminated the October 18, 2016 press release and made statements falsely describing the

Company's purported investigative process regarding the Galanis allegations. These false statements, made by the Board, or made in its name, and which the directors failed to timely retract or correct, contributed directly to a subpoena from, and an investigation by, the SEC, a highly damaging event for a public company.

123.   The Individual Defendants' improper statements, failure to maintain adequate internal controls, and the Board's flawed response to the allegations of impropriety regarding Galanis have severely impacted Banc's credibility. Furthermore, as a direct and proximate result of the Individual Defendants' actions, Banc has expended, and will continue to expend, significant sums of money.

124.   Such expenditures include costs incurred from responding to the ongoing SEC investigation, and defending and settling other related claims, including the securities class action, in which Judge Guilford has sustained allegations that stock purchasers were defrauded in connection with Banc's failure to timely disclose the Galanis allegations, and certified the class.

125.   Indeed, the Company's most recent Form 10-K filing, filed on March 1, 2019, Banc states as follows:

> On January 12, 2017, the Company received a formal order of investigation issued by the SEC and a subpoena seeking documents primarily related to certain of the issues that the Special Committee reviewed. The Company has been fully cooperating with the SEC in this investigation.

> The SEC investigation could lead to the institution of civil or administrative proceedings against the Company as well as against individuals currently or previously associated with the Company. Any such proceedings or threatened proceedings might result in the imposition of monetary fines or other sanctions against the named parties. Resulting sanctions could include remedial measures that might prove costly or disruptive to our business. Additionally, as discussed under Item 3 in Part I of this Annual Report on Form 10-K, a consolidated class action lawsuit was filed against the

Company on January 23, 2017, and other lawsuits have been filed against the Company by former officers and others. In addition to the risk of fines, sanctions, or monetary judgments, the SEC investigation and lawsuits may cause the Company to incur significant attorneys' fees, both with regards to counsel representing the Company and with regards to indemnity obligations incurred by the Company.

The pendency of the SEC investigation and any resulting litigation or sanctions, as well as the pending lawsuits (or any other lawsuits) could harm our reputation, leading to a loss of existing and potential customers, and our ability to attract and retain deposits and greater difficulty in securing financing or other developments which could adversely affect our liquidity, financial condition and future operating results.

126.   Notwithstanding these admitted, material adverse impacts and continuing risks to the Company, the Board has done nothing to seek recovery from the individual wrongdoers.

127.   Plaintiff seeks to remedy the foregoing harm through the recovery of monetary damages and implementation of corporate governance reforms.

**DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS**

128.   Banc is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

129.   Plaintiff will adequately and fairly represent the interests of Banc in enforcing and prosecuting its rights and has hired experienced counsel. Plaintiff was a shareholder of Banc at the time of the wrongdoing, has continuously been a shareholder since that time, and is currently a Banc shareholder.

130.   By the July 3, 2018 Demand, Plaintiff demanded, among other things, that Banc's Board immediately commence an investigation into allegations of misconduct by certain current and former officers and directors of Banc.

131.   Among other things, the Demand insisted that this investigation be conducted by independent Board members who are not implicated in the allegations of wrongdoing identified in the Demand, or named as a defendant in any related litigation arising from, or related in any way to, the Aurelius Blog, its contents, or Banc's response thereto.

132.   The Demand Letter specifically requested that the Board determine:

a.   whether any relationship exists or existed between Galanis and any member of Banc's management or Board, including but not limited to Sugarman, Brownstein, Schnel, Benett, Sznewajs, or Karish, regardless of whether that relationship resulted in a finding of control by Galanis;

b.   whether any such relationship between Galanis and any member of Banc's management of the Board was adequately disclosed;

c.   whether any Board member was responsible for the content of the October 18, 2016 press release that the Special Committee later found to include inaccurate statements;

d.   whether any Board member could have prevented the issuance of the October 18, 2016 press release or the subsequent repeating of those false statements by Grosvenor the following day;

e.   what harm Banc has suffered, either monetarily or to its reputation, from the issuance of the October 18, 2016 press release and follow up investigation;

f.   what improvements in Banc's internal controls would have reduced the chance of false and misleading statements being issued, including but not limited to statements contained in Banc's April 16, 2016 Proxy Statement and the October 18, 2016 press release;

g.   whether the Special Committee conducted a full and adequate investigation into allegations that its own members suffered from conflicts of interest or engaged in related party transactions that were not adequately disclosed or vetted;

h.   whether members of the Audit Committee submitted full and accurate information to Banc's auditor when justifying the

reassessment of accruals for certain executives in the first quarter of 2017; and

i. whether there was any improper motive in reassessing the bonuses for certain executives in the first quarter of 2017.

133.    The Demand also obligated the Board to identify who would conduct the investigation, whether outside counsel was retained (and the identity of any such counsel), and the scope of their investigative authority. The Demand further demanded improvements to Banc's corporate governance.

134.    The Demand was refused by the Refusal Letter dated January 4, 2019. According to the Refusal Letter, an "Ad Hoc" Committee had been formed to review the Demand, consisting of three (3) directors who joined the Board post-Aurelius Blog revelations. However, the Refusal Letter was not written by any such committee member, nor by the committee's counsel. Instead, the Refusal Letter was written by an interested director – Defendant Sznewajs.

135.    Indeed, the Refusal Letter made clear that the "Ad Hoc" Committee was not vested with Board authority to independently advance or dispose of any claims. Instead, it was formed only to make a recommendation to the Board for a vote, even though a majority of the Board members (5 of 9) were directly implicated in the allegations Plaintiff demanded that the Board investigate.

136.    In particular, Defendants Sznewajs, Benett and Schnel are themselves personally mentioned in the Aurelius Blog. In addition, they served on the Board during 2016, when: (a) the allegedly false and misleading Proxy Statement at issue in the securities class action was filed with the SEC; (b) the Board (which included each of them) was withholding from shareholders, Banc's auditors and the SEC that the Board had been aware of and investigating the Galanis allegations since 2015; (c) the Board (which included each of them) issued the phony October 18, 2016 press release, which was admittedly untrue and led to a subpoena from the SEC; and (d) the Company maintained failing internal controls, which were

directly within the purview of the Board's oversight responsibility. Defendants Sznewajs, Benett and Schnel also personally signed the 2016 Form 10-K with the disputed, allegedly manipulated financial results.

137.   In addition, Defendant Lashley was personally involved in the alleged improper bonus accounting, and, along with Bowers, signed the disputed SEC filings. Furthermore, Bowers was not independent because he was the full-time CEO of Banc, and reliant on other directors for his position and compensation.

138.   Thus, a Board majority (5 of 9) was not entirely disinterested. Instead, it was personally involved in the disputed conduct, and should have been isolated from the demand review process, but instead they controlled the outcome. This confirms that the self-interest of the decision-makers was prioritized over the substance of the Demand response. This alone demonstrates that the Board did not act independently, and that its investigation was not reasonable nor in good faith.

139.   According to the Refusal Letter, the "Ad Hoc" Committee of the Board hired Bergeson LLP ("Bergeson") to investigate the Demand. However, the "Ad Hoc" Committee and Bergeson gave way to Defendant Sznewajs, who personally prepared the Refusal Letter. Plainly, neither the "Ad Hoc" Committee nor its counsel were authorized to the exercise the Board's authority, or even speak for the Board on the issues with which they were tasked.

140.   According to the Refusal Letter, the "Ad Hoc" Committee allegedly met seven times to direct, review, and consider the investigative work conducted by its counsel, and worked with counsel to prepare a report of its findings and recommendations. Ostensibly in reliance upon "a detailed 54-page report, plus 53 exhibits" presented to the Board on November 20, 2018, the Refusal Letter stated that "the Board has determined that it would not be in the best interest of the Company to pursue the claims alleged in the Gordon Demand Letter or implement any additional remedial measures at this time."

141.   According to the Refusal Letter, the "Ad Hoc Committee" provided its purported report and exhibits to the Board on November 20, 2018, yet only 8 days later (a span of time that included a four day long holiday weekend), the Board "adopted" the report of the "Ad Hoc" Committee. No Board could have in good faith analyzed the contents of the purported 54-page report and 53 exhibits and made an informed vote in such a short period.

142.   In the Supplemental Demand Letter dated January 24, 2019, Plaintiff wrote the Board for a second time, reasonably and in good faith requesting that the Board provide Plaintiff with backup documentation regarding its processes and conclusions, including the report and exhibits, as follows:

> [P]lease provide us the Ad Hoc Committee's report of its findings and recommendations to the Board together with all exhibits, interview notes, and all analyses regarding the independence of committee members.  Also, please provide us the minutes and presentations from all Ad Hoc Committee meetings. In addition, please provide us the retainer agreement with Bergeson, LLP.  Lastly, please also provide us the underlying releases and any other documents evidencing the company's agreements with any executives referenced in your letter, including the separation agreement with Steve Sugarman, as well as all documents upon which the Board relied to determine whether such agreements are enforceable.
>
> Given all of these documents already have been gathered and are in your possession, we ask that you provide us all of these documents not later than close of business on Friday, February 1, 2019.

143.   By the Supplemental Refusal Letter dated February 1, 2019, again written by Defendant Sznewajs, Banc refused to provide Plaintiff any of the documents sought in the Supplemental Demand Letter.

144.   Defendant Sznewajs's letter stating that information underlying the investigation would be kept from Plaintiff further confirms that the Board did not

engage in a reasonable, good faith investigation of the Demand. As illustrated in Exhibit D, Defendant Sznewajs provided no basis for refusing to provide any of the documents requested, and there is no reason for Banc to withhold the evidence now.

145.   Defendant Sznewajs's Refusal Letter and the Supplemental Refusal Letter only serve to expose the fatally flawed process used by the Board in responding to the Demand. These developments confirm that from the outset, the "Ad Hoc" Committee's hands were tied by a Board majority, and the outcome of the Ad Hoc Committee's investigation was preordained.

146.   In addition, from what little information *can* be gleaned from the Refusal Letter, it is also clear that the "Ad Hoc" Committee did not undertake an investigation that complies with applicable law.

147.   First, the Board has failed to establish that the "Ad Hoc" Committee retained competent, independent counsel to conduct the investigation. In the Supplemental Demand Letter, Plaintiff requested the retainer agreement with Bergeson so as to ascertain its independence, the scope of its representation, and who was paying its bills. The Board refused to provide this information. Furthermore, while Bergeson contacted Plaintiff's counsel to request information, it never extended an invitation to Plaintiff's counsel to meet with the "Ad Hoc" Committee. This is not indicative of a reasonable, good faith investigation.

148.   Second, while the Board claims that the "Ad Hoc" Committee produced a 54-page report with 53 exhibits upon which the Board relied, all Plaintiff received is a conclusory letter authored by one of the primary targets of the investigation. The "Ad Hoc" Committee's procedures, reasoning and conclusions, upon which the Board purportedly relied in voting down any claims, remain a mystery, except to the extent Defendant Sznewajs (an interested party) summarized them in his Refusal Letter.

149.   <u>Third</u>, the Refusal Letter fails to respond to many of the specific issues identified in Plaintiff's Demand, and instead repeats, over and again, the mantra that the "Ad Hoc" Committee found "no evidence" of wrongdoing.

150.   The Refusal Letter:

    a.   Fails to elaborate on the Galanis relationships with others among the Board and management;

    b.   Fails to elaborate on its conclusion that no disclosure regarding the Galanis relationships needed to be made;

    c.   Fails to describe facts regarding the directors' individual roles in the phony October 18, 2016 press release;

    d.   Fails to address the directors' conduct in permitting Grosvenor's false statements about said press release;

    e.   Fails to analyze or quantify harm suffered by Banc as a result of the phony October 18, 2016 press release;

    f.   Fails to provide an analysis of Plaintiff's proposed corporate governance improvements, while writing them off as unnecessary;

    g.   Fails to state whether the Board conducted an analysis of its own members' related party transactions and undisclosed relationships, as demanded;

    h.   Fails to describe what information was provided by the Audit Committee to the auditor in connection with the alleged improper bonus accounting;

    i.   Fails to discuss the alleged motive for the alleged improper bonus accounting, as described by former executives with alleged personal knowledge of the matter.

151.   <u>Fourth,</u> the Refusal Letter fails to identify what witnesses were interviewed by the "Ad Hoc" Committee, and whether such witnesses even

1    included directors, officers or employees with relevant knowledge. Instead, it

2    appears the Ad Hoc Committee only reviewed depositions of such key witnesses.

3        152.   <u>Fifth</u>, the Refusal Letter fails to identify with any specificity what

4    documents the "Ad Hoc" Committee reviewed, and whether those documents were

5    relevant to the specific issues raised in Plaintiff's Demand. Furthermore, the

6    Refusal Letter states that the "Ad Hoc" Committee considered "reports and other

7    documents from prior investigations" without describing these in any detail, who

8    authored such "reports," and what the purposes or conclusions of such

9    investigations even were.

10       153.   <u>Sixth,</u> the Refusal Letter claims that the "Ad Hoc" Committee met

11   seven times. Plaintiff requested minutes of the relevant meetings to ascertain

12   information about these meetings, but Defendant Sznewajs refused.

13       154.   In addition, the Refusal Letter concedes that the "Ad Hoc" Committee

14   failed to evaluate any claim as against Sugarman, on the purported basis that such

15   claims had already been released. The Refusal Letter so states even though

16   "concerns were raised" regarding Sugarman's conduct with respect to several of

17   the key allegations made in the Demand. The Refusal Letter states in conclusory

18   terms that Banc could not "void" the Sugarman's release, but Plaintiff's reasonable

19   request to inspect the governing documents was denied.

20       155.   In sum, the Demand Refusal provided only unsupported conclusions

21   regarding the Board's procedure, and failed to provide Plaintiff any meaningful

22   factual analysis underlying the bases for its conclusions. The Board's investigation

23   in response to the Demand was unreasonably incomplete and, as a result, the Board

24   did not act on an informed basis when it rejected the Demand. The refusal therefore

25   was not a valid exercise of business judgment.

26       156.   The Board did not conduct a sufficient investigation to inform itself

27   whether the claims in the Demand had merit. Contrary to the Refusal's assertion

28   that exculpation rights render the claims unworthy of pursuit, there is no

exculpation defense where, as here, there is active and deliberate dishonesty, and the fiduciaries obtained improper benefits.

157.   The Refusal Letter shows the Board simply ignored, or failed to consider in good faith, the strong evidence demonstrating the merits and probability of success of the claims against the defendants.

158.   Nor did the Board evaluate whether it would be in Banc's interests to seek compensation for any of defendants' non-exculpable breaches of the duty of loyalty in light of the chances of success compared to the potential damages recoverable. It does not appear that any of the defendants would be judgment-proof or lacking in assets sufficient to fund a reasonable settlement of claims or a judgment. A potential recovery could offset Banc's substantial damages.

159.   The Board's failure to empower a true independent committee to actually exercise the Board's authority, conduct a reasonable investigation, properly evaluate the merits, apply correct legal standards, evaluate chances for a recovery, potential amounts recoverable, or even provide to Plaintiff a report documenting its supposed investigation cannot be deemed a valid exercise of business judgment entitled to any presumption of reasonableness and good faith under law.

160.   No legal action has been filed by Banc against any of the Individual Defendants. The primary architects of the scandal detailed herein have been allowed to remain, resign or retire.

161.   Accordingly, Plaintiff's institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

## CLAIMS FOR RELIEF

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

162.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

163.   The Individual Defendants, by reason of their positions as officers and directors, and because of their ability to control the business and corporate affairs of Banc, owed to Banc an obligation to act in good faith, in a manner reasonably believed to be in the best interest of Banc, and with the ordinary care and candor that a prudent person would use in similar circumstances.

164.   The Individual Defendants acted in breach of their fiduciary duties.

165.   The Individual Defendants acted with active and deliberate dishonesty in making, or causing Banc to make, false and misleading statements to shareholders, the market and the SEC in filings regarding Banc's business and operations. The Individual Defendants received improper benefits, including substantial compensation, their continued access thereto and their continued positions, as a result of their breaches of fiduciary duty.

166.   The misconduct of the Individual Defendants is not exculpated under Maryland or other applicable law.

167.   As a direct and proximate result of these breaches, Banc has sustained significant damages.

168.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Banc, demands judgment as follows:

A.   Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' misconduct and breaches of fiduciary duties;

B.   Directing Banc to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Banc and its shareholders from a repeat of the damaging events described herein, including, but not limited to, adopting corporate governance policies to: (a) strengthen the Company's controls over disclosure and financial reporting; (b)

strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; (c) strengthen Banc oversight of its disclosure procedures; and (d) prevent or undo self-dealing and related party transactions;

       C.    Determining and awarding Banc the damages it sustained as a result of the violations set forth above and restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

       D.    Granting extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder;

       E.    Determining and awarding Banc the damages sustained by it as a result of the Individual Defendants' breaches of fiduciary duties, as set forth above, from each of the Individual Defendants, jointly and severally, together with interest thereon; and

       F.    Awarding Plaintiff the costs and disbursements of this action, including reasonable fees and costs to Plaintiff's attorneys, accountants, and experts.

## JURY DEMAND

       Plaintiff demands a trial by jury on all issues so triable.

Dated: April 2, 2019       By: */s/ Willem F. Jonckheer*
                           ROBERT C. SCHUBERT (S.B.N. 62684)
                           WILLEM F. JONCKHEER (S.B.N. 178748)
                           SCHUBERT JONCKHEER & KOLBE LLP
                           Three Embarcadero Center, Suite 1650
                           San Francisco, CA 94111
                           Telephone:   (415) 788-4220
                           Facsimile:    (415) 788-0161
                           rschubert@sjk.law
                           wjonckheer@sjk.law

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COREY D. HOLZER (pro hac vice to be filed)
MARSHALL P. DEES (pro hac vice to be filed)
HOLZER & HOLZER
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Telephone:    (770) 392-0090
Facsimile:    (770) 392-0029
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Counsel for Plaintiff*

# EXHIBIT A

# HOLZER & HOLZER, LLC

ATTORNEYS AT LAW

1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338

770.392.0090 (ph)
770.392.0029 (fax)
888.508.6832 (toll free)
www.holzerlaw.com

July 3, 2018

<u>VIA CERTIFIED U.S. MAIL</u>

Board of Directors
Banc of California, Inc.
3 MacArthur Place
Santa Ana, CA 92707

Re:    <u>**Shareholder Demand Pursuant to Maryland Law**</u>

Dear Members of the Board:

This firm, together with Willem Jonckheer of Schubert Jonckheer & Kolbe LLP, represents Kristopher Gordon, a holder of Banc of California, Inc. ("Banc" or the "Company") common stock (the "Stockholder"). On behalf of Stockholder, we demand that the Board of Directors (the "Board") immediately commence a good faith investigation into allegations of serious misconduct by certain current and former officers and directors. The Board should then take appropriate steps to remedy the indentified breaches of fiduciary duty and improve Banc's corporate governance.

As described herein, for several years Banc has been plagued by claims that top executives and members of the Board concealed extensive financial relationships with Jason Galanis, improperly directed corporate funds through conflicted related party transactions, and failed to ensure adequate controls were implemented over financial reporting. Banc's stock price has not kept pace with its sector and, despite efforts to discredit the allegations, the stock still trades at approximately the price if fell to after the Galanis allegations were first made public in October 2016. It is time for Bank to move forward decisively by transparently investigating and resolving these issues.

## I.  BACKGROUND

### A.  An Online Report Warns Investors that Banc Could Be Secretly Controlled by a Known Fraudster

On October 18, 2016, a blog post on *SeekingAlpha* entitled "BANC: Extensive Ties to Notorious Fraudster Jason Galanis Make Shares Un-Investible" (the "Aurelius Blog") alleged the existence of a web of improper and dangerous relationships between Galanis, a Los Angeles

financier and convicted securities fraudster, and some of Banc's senior managers, including Steven Sugarman ("Sugarman"), then Banc's Chief Executive Officer ("CEO"), and Chad Brownstein ("Brownstein"), then Banc's Lead Independent Director. The Aurelius Blog cited charges brought by the United States Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC") against Galanis, which revealed an undisclosed threat to Banc.

Specifically, the Aurelius Blog detailed Galanis's fraudulent use of a Bermuda-based insurance holding company, Valor Group, and its subsidiaries to defraud investors through sham tribal bond placements (the "Tribal Bond Scheme") between 2014 and 2016. Galanis and his co-conspirators induced a Native American tribal entity to issue bonds based on lies about how the bond proceeds would be invested. The Valor Group, through its subsidiaries, secretely financed the acquisition of investment managers who purchased fraudulent tribal bonds to create artificial demand. Galanis and others then transferred the proceeds raised by the bond sales to shell corporations and used the funds to pay for the co-conspirators' personal expenses.

The Aurelius Blog claimed that Valor Group was controlled by COR Capital LLC ("COR"), which in turn was secretly controlled by Galanis. The Aurelius Blog supported this conclusion by revealing a number of relationships linking COR, Sugarman and Galanis to the Tribal Bond Scheme. COR was officially owned by Sugarman, and the entity played an integral role during the recapitalization of Banc's predecessor entity in 2010. Among the overlapping relationships, former COR executive Hugh Dunkerley, who played a role in incorporating Valor Group while he was employed at COR, was indicted for securities fraud in connection with the scheme. Sugarman's brother, Jason, was the founder, chairman and CEO of Valor Group during the Tribal Bond Scheme, while at the same time receiving compensation from a subsidiary of Banc to act as a consultant.

COR entities were also accused of facilitating the Tribal Bond Scheme. Specifically, Wealth-Assurance AG acted as Valor Group's primary insurance subsidiary, and Burnham Financial, which maintained its headquarters in the same building as Banc, served as the placement agent for the bonds. COR itself was listed by Galanis as a financial sponsor of the fraudulent bonds and references to COR's relationship with Banc appeared on documents used by Galanis to enhance his credibility with investors he was defrauding.

The Aurelius Blog and accompanying documents also suggested that Sugarman held a majority interest in an entity named JAS Partners 1, LLC ("JAS Partners"). JAS Partners purportedly controlled Camden Capital Partners, LLC ("Camden"), which was an entity used by Galanis to finance the Tribal Bond Scheme. Camden was also utilized by Galanis during an earlier fraudulent scheme that he operated from 2009 to 2011 designed to defraud the public shareholders of Gerova Financial Group, Ltd. ("Gerova"). Galanis obtained secret control of millions of shares of stock and then manipulated the market for the stock as the conspirators caused their secretly held shares to be sold. He pled guilty to the Gerova fraud in July 2016.

In addition, the Aurelius Blog alleges ties between Galanis and Brownstein. In 2011, a private investment firm run by Brownstein was a major investor in Prospect Global Resources, Inc. ("Prospect Global"), an entity which the SEC identified as a company Galanis controlled, and to which he funneled money obtained through his frauds. The Aurelius Blog further

questioned Brownstein's independence, noting that Brownstein received an undisclosed loan through Camden that appeared to be used to finance outside business ventures.

### B. Banc's Response to the Aurelius Blog Ignites a Government Investigation After Admissions That the Press Release Contained False Statements

Banc responded to the Aurelius Blog in an October 18, 2016 press release, stating that "the Company's Board of Directors" had already been aware of the Galanis allegations, but that Banc's Board, acting through "disinterested directors," had immediately initiated a "thorough independent investigation" of the matter "led by Winston & Strawn" and had received "regular reports" regarding the investigation, "including related to regulatory and governmental communications over the past year." Banc's press release discredited the Galanis allegations, denied the existence of ties with him, and stated that the "disinterested directors will make further facts publicly available as appropriate."

On October 19, 2016, the denials were repeated by Banc's General Counsel, John Grosvenor ("Grosvenor"), in an investor conference call. Grosvenor stated that in 2015, the "Board of Directors determined to retain outside counsel to independently investigate the matters raised" by Galanis and that "the Board, acting through its Disinterested Directors, immediately initiated a thorough independent investigation" and had received "regular reports" from Winston & Strawn along the way.

On or about October 27, 2016, Banc received an inquiry from its auditor, KMPG, which raised questions about the potential involvement of Galanis in Banc's operations and the Company's response to the Aurelius Blog. In response, the Board created a Special Committee to investigate. However, the Special Committee included four board members who were themselves mentioned in the Aurelius Blog as having undisclosed conflicts of interest, questionable associations and past allegations of misconduct. These were directors Jonah Schnel ("Schnel"), Jeffrey Karish ("Karish"), Halle Benett ("Benett") and Robert Sznewajs ("Sznewajs"), three of whom remain as Board members.

Specifically, the Aurelius Blog alleged that (a) Schnel was a partner of Brownstein's, and the two had cofounded a company; (b) Karish was a director at Digital Turbine with an in-law of Sugarman; (c) Benett was an investment banker with Keefe, Bruyette & Woods ("KBW") which had been "paid millions by BANC as underwriter of securities offerings;" and (d) Sznewajs was previously the CEO of West Coast Bank, which received a Cease and Desist Order from regulators in 2009 due to "management whose policies and practices are detrimental to the bank."

On January 23, 2017, Banc reported in a press release that the Special Committee concluded that the Galanis allegations in the Aurelius Blog were false. However, the Special Committee also reported that Banc's own October 18, 2016 press release denying the allegations was itself false.

Specifically, the Special Committee revealed that Winston & Strawn's earlier investigation was not directed by "disinterested" directors, but by "management," that Winston

& Strawn was not "independent," having previously represented Banc and Sugarman personally, and that the Board had not received "regular reports" of the purported investigation. Banc also disclosed that its October 18, 2016 response to the Aurelius Blog had triggered an SEC subpoena and investigation. That SEC investigation is captioned In the Matter of Banc of California NY-09592 and remains unresolved after more than 18 months.

### C. The Board's Special Committee Investigation Leads to the Departure of Several Top Executives and Allegations of Board Misconduct

In a separate press release issued January 23, 2017, Banc announced Sugarman's resignation from all positions with the Company.  On or around January 25, 2017, Banc terminated Carlos P. Salas, who had served as a consultant to Banc since mid-2016 and had been hired as Executive Vice President and Chief of Staff. On or around March 13, 2017, Jeffrey Seabold, a Banc founder and Executive Vice Chairman, was involuntarily placed on indefinite administrative leave. And on May 29, 2017, Heather Endresen, Managing Director, SBA (Small Business Administration) Lending, was terminated from her position.  In detailed litigation filings, each of these individuals described serious internal control failures at Banc and misconduct by several members of the Board.

#### 1. Allegations that the Special Committee Did Not Conduct an Adequate Investigation

On September 5, 2017, Seabold sued Banc in Los Angeles Superior Court, Case No. BC 674694, for wrongful discharge in violation of public policy and breach of contract, among other things. Seabold accused Banc of a scheme executed by the Special Committee members to avoid the consequences of their own misconduct and conflicts of interest, entrench themselves and their cronies on Banc's Board, and eliminate anyone standing in their way. Seabold included detailed allegations regarding the conflicts of each member of the Special Committee. According to Seabold, despite never uncovering evidence of any improper relationships between Banc and Galanis, Benett, Karish, Sznewajs, and Schnel successfully manipulated the Special Committee to achieve their goal of removing Sugarman and others and assuming control of Banc.

On August 11, 2017, Salas sued Banc in Los Angeles Superior Court, Case No. BC 672208, for breach of contract, wrongful termination, fraud and other statutory violations. Salas alleges that, through his role as Executive Vice President and Chief of Staff, he became aware through multiple sources of allegations and evidence of wrongdoing by members of the Special Committee that went unaddressed.

In a recent filing in the related securities class action, Sugarman submitted a declaration that the members of the Special Committee blocked an investigation into their own conflicts of interest. In his sworn statement, Sugarman stated that in early December 2016, Banc initiated a risk management and compliance review "to ensure there were not unknown risks present related Banc's compliance with its Governance Guidelines, Code of Conduct, and other key governance policies." According to Sugarman, "during this process I became aware of several

potential disclosure, control, and compliance and SOX items associated with directors Jeffrey Karish, Halle Benett, Jonah Schnel and Robert Sznewajs, and others."

### 2. Allegations that Banc Manipulated Reported Financial Results.

Two former executives also allege that, as the Aurelius Blog scandal engulfed Banc, Banc's management, with approval of the Audit Committee, sought ways to artificially inflate Banc's first quarter 2017 financial results.

According to Seabold, it became apparent as early as January 2017 that Banc would fall short of consensus operating results for the first quarter 2017. Yet, Banc continued to provide the market with public guidance that Banc would achieve $2.00 earnings per share (EPS) for the year. Banc then initiated a so-called "reassessment" for accruals for 2016 bonuses, reversing $7.8 million in such accruals, which artificially increased earnings for the first quarter of 2017.

On December 7, 2017, Endresen sued Banc in Los Angeles Superior Court, Case No. BC 685641, for wrongful termination, breach of contract and violations of various labor statutes. Like Seabold, Endresen alleges, among other things, that she was fired for reporting improper accounting practices in Banc's financial disclosures. Specifically, Endresen claims that as early as January 2017, she was informed that Banc had decided to scale back the Company bonus pool but unlawfully failed to account for the reversal in a timely manner, which allowed for the artificial inflation of first quarter results.

For purposes of evaluating the reasonableness of the estimated accrued incentive compensation recorded in Banc's records as of December 31, 2016, management was required to evaluate and consider all information that was available through March 1, 2017, the date that Banc's 2016 financial statements on Form 10-K were filed with the SEC. If it was likely that some or all of the incentive compensation bonuses accrued at December 31, 2016 would not be paid, such amounts should have been reversed as of December 31, 2016, prior to issuance of Banc's 2016 financial statements, rather than being reversed for the quarter ended March 31, 2017.

### D. Banc Admits to Material Internal Control Weaknesses.

In the Form 10-K for 2016, filed on March 1, 2017, Banc's auditor KPMG stated that the Company suffered from material weaknesses in its internal controls and suffered from a "number of control deficiencies across multiple processes." These matters are the direct responsibility of the Board. According to its auditor, Banc "has not maintained effective internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)."

## II. ONGOING LITIGATION HAS AND CONTINUES TO HARM THE COMPANY

Banc is a defendant in a securities fraud class action pending in the Central District of California, styled *In re Banc of California Securities Litigation*, Docket No. 8:17-cv-00188-AJG (C.D. Cal. Jan. 23, 2017) (the "Securities Class Action"). The lead plaintiff in the Securities Class Action, Iron Workers Local No. 25 Pension Fund, alleges that Banc, Sugarman, and former Chief Financial Officer James J. McKinney issued false and misleading statements that (1) failed to disclose material information about numerous connections Sugarman and other top Banc executives and directors had with Galanis; (2) misled investors about the independence of Banc's "disinterested directors" in its SEC filings in connection with their approval of related-party transactions that unjustly enriched Sugarman and his family; and (3) failed to disclose that Banc's management was in the midst of an internal investigation into the Company's ties with Galanis.

By order dated September 6, 2017, U.S. District Judge Andrew Guilford sustained allegations that stock purchasers were defrauded in connection with Banc's failure to timely disclose the Galanis allegations. On May 31, 2018, Judge Guilford granted the lead plaintiff's motion to certify a class of persons and entities that purchased or otherwise acquired Banc stock between April 15, 2016 and January 20, 2017 and were damaged thereby. Banc now faces a serious threat of substantial liability from the litigation.

In addition to the substantive and procedural setbacks endured by Banc in the Securities Class Action to date, a number of discovery rulings have and will result in the disclosure of information bearing on the existence of the alleged undisclosed misconduct and conflicts that undermined the sufficiency of the Special Committee's investigation. Among the most noteworthy is the ruling by Magistrate Judge Douglas F. McCormick that granted Sugarman's motion to compel Karish to produce evidence about his prior employment that Sugarman claimed disqualified Karish from acting as an independent member of the Board. Karish resigned his directorship shortly after the ruling.

Separately, in its recently filed Form 10-K, Banc disclosed that it settled Seabold's lawsuit for approximately $5 million – representing the full amount Seabold demanded. Banc also continues to defend itself in the other employment lawsuits that have now been sent to arbitration. The additional costs associated with the various lawsuits and investigations arising from the failure to timely and accurately disclose information about Galanis and the subsequent exodus of executives now exceed $12 million,

## III. DEMAND FOR INVESTIGATION

Stockholder hereby demands the Board immediately commence an investigation into the conduct described herein as it relations to potential violations of the federal securities laws and/or breaches of fiduciary duty owed to Banc. The investigation must be conducted by independent members of the Board who are not implicated in the allegations of wrongdoing identified in this letter or named as a defendant in any litigation arising from or related in any way to the Aurelius Blog, its contents, or Banc's response. The investigation should determine:

1) whether any relationship exists or existed between Galanis and any member of Banc's management or Board, including but not limited to Sugarman, Brownstein, Schnel, Benett, Sznewajs, or Karish, regardless of whether that relationship resulted in a finding of control by Galanis;

2) whether any such relationship between Galanis and any member of Banc's management of the Board was adequately disclosed;

3) whether any Board member was responsible for the content of the October 18, 2016 press release that the Special Committee later found to include inaccurate statements;

4) whether any Board member could have prevented the issuance of the October 18, 2016 press release or the subsequent repeating of those false statements by Grosvenor the following day;

5) what harm Banc has suffered, either monetarily or to its reputation, from the issuance of the October 18, 2016 press release and follow up investigation;

6) what improvements in Banc's internal controls would have reduced the chance of false and misleading statements being issued, including but not limited to statements contained in Banc's April 16, 2016 Proxy Statement and the October 18, 2016 press release;

7) whether the Special Committee conducted a full and adequate investigation into allegations that its own members suffered from conflicts of interest or engaged in related party transactions that were not adequately disclosed or vetted;

8) whether members of the Audit Committee submitted full and accurate information to Banc's auditor when justifying the reassessment of accruals for certain executives in the first quarter of 2017; and

9) whether there was any improper motive in reassessing the bonuses for certain executives in the first quarter of 2017.

Please confirm as soon as possible, but not later than 14 days from today, that the Board has commenced an investigation into these matters. Please also identify who has been appointed to conduct the investigation, whether they have retained outside counsel (and identify any such counsel), and the scope of the investigative authority.

## IV. DEMAND FOR RELIEF

In the event the Board's investigation concludes there is evidence that any current or former executive, or any current of former Board member, engaged in unlawful behavior – including breaches of fiduciary duty – the Board should commence civil litigation again each wrongdoer to recover monetary damages for the Company and take other action as appropriate to protect Banc's best interests.

Further, Banc continues to suffer from internal control deficiencies that can and should be remedied through improved corporate governance, including but not limited to the following:

1) the nomination of two (2) new independent directors to the Board within the next calendar year;

2) the creation of a Disclosure Committee, consisting of officers, directors, and other necessary personnel, to manage the content and quality of all statements or information provided to shareholders and to ensure, among other things, the statements are accurate and complete. The Disclosure Committee must be empowered to promptly correct any inaccurate statements.

3) the adoption of rigorous interested party and/or conflict of interest policies governing the Company's officers and directors, which shall be posted to Banc's website.

4) a broadening of the Company's clawback policies so that the Company may recoup compensation whenever the Company is harmed by executive misconduct, and detailed disclosure to shareholders of all instances in which recoupment occurs.

5) the adoption of protocol to ensure any future special committee of the Board is independent of, and disinterested in, the subject matter of the investigation. This should include standards for defining the scope of any investigation, selecting independent and disinterested advisors to assist with the investigation, and transparently reporting the results; and

6) such other reforms as necessary to remediate any deficiencies identified through the investigation.

While not an exhaustive list, we believe these reforms would significantly advance the interests of Banc and its shareholders in moving past the fallout from the Aurelius Blog. We are available to discuss specific ways in which these corporate governance reforms can be designed and implemented.

Thank you for your attention to this matter. Do not hesitate to contact me if you have any questions or wish to discuss.

Regards,

Corey D. Holzer

cc:     Mark R.S. Forester (via PDF email only)
        Roman E. Darmer (via PDF Email only)
        Adina W. Stowell (via PDF email only)

# EXHIBIT B



January 4, 2019

**VIA E-MAIL**

Cory D. Holzer, Esq.
Holzer & Holzer, LLP
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
cholzer@holzerlaw.com

**Re: *Banc of California Shareholder Litigation Demand***

Dear Mr. Holzer,

     I write in response to your letter of July 3, 2018 (the "Gordon Demand Letter"), in which you demand, on behalf of your client, Kristopher Gordon, that the Board of Directors (the "Board") of Banc of California, Inc. (the "Company") pursue certain derivative claims on behalf of the Company against certain current and former directors and officers of the Company. After due consideration, the Board has determined that it is not in the best interest of the Company to pursue the claims alleged in the Gordon Demand Letter.

     Following receipt of the Gordon Demand Letter, as well as two other demand letters from counsel for two other shareholders (collectively, the "Demand Letters"), the Board formed an Ad Hoc Committee consisting of directors Kirk Wycoff, Mary Curran, and Bonnie Hill to investigate the issues and potential claims raised in the Demand Letters and to make recommendations to the Board with respect to the Demand Letters (the "Ad Hoc Committee"). The Ad Hoc Committee hired independent counsel, the law firm of Bergeson, LLP, to assist in its investigation. Bergeson, LLP has not previously been engaged by the Company in any capacity and has not done work for any current or former Company officers or directors. Over the course of approximately 10 weeks, the Ad Hoc Committee and its counsel investigated the circumstances alleged in the Demand Letters (the "Investigation"). The Ad Hoc Committee met seven times to direct, review, and consider the investigative work conducted by its counsel and worked with its counsel to prepare a report of its findings and recommendations.

Cory D. Holzer, Esq.
January 4, 2019
Page 2

The Ad Hoc Committee and its counsel investigated various alleged claims, including claims relating to: (1) allegations that Jason Galanis had control over the Company and Company personnel; (2) the Winston & Strawn investigation of alleged relationships between Galanis and Company personnel (the "Winston & Strawn Investigation"); (3) the press release issued by the Company in response to the October 18, 2016 *SeekingAlpha* blog post (the "October 18, 2016 Press Release"); (4) the prior ad hoc committee (the "Prior Ad Hoc Committee") investigation that followed after the aforementioned press release (the "Prior Ad Hoc Committee Investigation"), and its determinations and purported conflicts of the committee members; (5) transactions allegedly benefitting certain relatives of former Chairman and CEO Steve Sugarman; (6) certain loans received by former director Chad Brownstein; (7) the reversal of the fiscal year 2016 bonus accrual; and (8) the material weakness in internal controls over financial reporting identified by the Company and its independent accounting firm, KPMG, in 2016.

The Investigation included: (1) interviewing multiple witnesses; (2) reviewing multiple documents, including reports and other documents from prior investigations; (3) reviewing deposition and other testimony from multiple witnesses, including certain directors, officers, and employees; (4) reviewing pleadings, orders, and discovery responses in relevant litigation matters; (5) reviewing employment and separation agreements with certain former executives; (6) reviewing relevant Company SEC filings and exhibits thereto; (7) conducting additional research, including research into the requirements for establishing liability for damages by directors and officers and the applicability of those requirements to the Ad Hoc Committee's findings; and (8) analyzing potential recoverable damages and the likelihood of prevailing on potential claims for damages, as well as the financial cost to the Company of pursuing those claims.

The Ad Hoc Committee has determined that with respect to the claims alleged in the Demand Letter, there are some specific limitations on liability that limit the Company's ability to pursue claims against its former and current officers and directors.

First, Section 2-405.1 of the Maryland Corporations and Associations Code (the "Maryland Code") limits directors' responsibilities to performing their duties in good faith, in a manner they reasonably believe to be in the corporation's best interests, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.

Second, the Company, in its Second Articles of Restatement (the "Articles"), adopted a limitation of liability provision that significantly limits the circumstances under which the Company can recover damages on claims against its former and current officers and directors. This exculpatory provision was adopted as part of the Articles in accordance with Section 5-418 of the Maryland Code, which allows Maryland

Cory D. Holzer, Esq.
January 4, 2019
Page 3

corporations to limit the monetary liability of their officers and directors to the amount of "improper benefit or profit in money, property or services" or for "active and deliberate dishonesty."

Consequently, allegations of negligence or breach of fiduciary duty alone are not sufficient to establish monetary liability on the part of a Company officer or director. Rather, for the Company to recover monetary damages from any past or current officer or director, the Company must show that the officer or director either received an improper benefit or acted with active and deliberate dishonesty.

Given that legal standard, the Ad Hoc Committee has not identified a claim relating to the facts alleged in the Gordon Demand Letter, the other Demand Letters, or other facts discovered during its investigation, as to which the Company would have a reasonable possibility of prevailing on a claim for damages.  With respect to the facts alleged in the Gordon Demand Letter specifically, the Ad Hoc Committee has made the following determinations.

First, with respect to potential claims described in the Gordon Demand Letter against former Chairman and CEO Steve Sugarman regarding (1) ties to Jason Galanis, including purported relationships involving COR Capital, LLC and other "COR" entities, Camden Capital Partners, LLC and Camden Real Estate Opportunity Fund I (collectively "Camden") and the purported failure to disclose such ties, (2) the October 18, 2016 press release, or (3) other claims alleged in the *In re Banc of California Securities Litigation*, the Company has released Mr. Sugarman from any such claims in its separation agreement with Mr. Sugarman (the "Separation Agreement").  The Company's decision to enter into the Separation Agreement was made with the advice of counsel with respect to the ability of the Company to meet the requirements of Mr. Sugarman's Employment Agreement for termination for Cause and obtained the benefits of a release of claims from Mr. Sugarman, avoiding litigation, and Mr. Sugarman's resignation from the Company's board of directors.  The Ad Hoc Committee also considered whether the Company has any ability to void the Separation Agreement and determined that the applicable law does not support an argument that the Company can void the Separation Agreement.

Second, with respect to potential claims described in the Gordon Demand Letter relating to the relationship between Jason Galanis and the Company and Company officers and directors more generally, the Ad Hoc Committee has not discovered evidence supporting claims in the Gordon Demand Letter that Galanis directly or indirectly controlled the Company or a Company officer or director.  Nor has the Ad Hoc Committee discovered evidence that a Company officer or director fraudulently failed to disclose a relationship with Galanis that required disclosure or obtained a benefit from such non-disclosure.

Cory D. Holzer, Esq.
January 4, 2019
Page 4

Third, specifically with respect to potential claims against former director Chad Brownstein, the Ad Hoc Committee has not discovered evidence that Mr. Brownstein committed fraud in connection with the events alleged in the Gordon Demand Letter or that he received an improper benefit from the Company in connection with those events. Specifically, the Ad Hoc Committee has not discovered evidence that Galanis exerted any control over Brownstein as a result of Galanis' relationship with Prospect Global Resources Inc. As for the loans Mr. Brownstein received from Camden, the Gordon Demand Letter does not claim that the loans Mr. Brownstein received from Camden were not made under commercially reasonable terms, and the Ad Hoc Committee has not discovered evidence that Mr. Brownstein received an improper benefit in connection with the loans.

Fourth, with respect to the October 18, 2016 Press Release and related events, the Ad Hoc Committee has not discovered evidence of fraud in connection with the October 18, 2016 Press Release. The Ad Hoc Committee has not discovered evidence supporting a claim that use of the statements in the October 18, 2016 Press Release regarding "Disinterested Directors" and an "independent investigation" was done with the intention to defraud Company shareholders or another party. The Ad Hoc Committee has not discovered evidence that October 18, 2016 Press Release's descriptions of the Winston & Strawn Investigation's conclusions concerning the Galanis relationship with the Company were materially inaccurate. And, the Ad Hoc Committee has not discovered evidence that the Winston & Strawn Investigation was not performed in good faith in an effort to determine the truth with respect to whether the Company had a relationship with Galanis.

Fifth, with respect to the Prior Ad Hoc Committee Investigation, the Ad Hoc Committee has not discovered evidence of fraud in connection with the investigation or evidence that an officer or director wrongfully enriched him or herself in connection with that investigation. Indeed, the Gordon Demand Letter does not claim that the any of the Prior Ad Hoc Committee's specific findings were not accurate or that WilmerHale was not independent. Further, the Ad Hoc Committee's investigation of the allegations in the Gordon Demand Letter regarding purported conflicts of interest on the parts of members of the Prior Ad Hoc Committee has not discovered evidence of (i) any action on the part of a member of the Prior Ad Hoc Committee taken to influence the direction of the Prior Ad Hoc Committee Investigation in an improper manner, or (ii) any improper benefit received by a member of the Prior Ad Hoc Committee as a result of the Prior Ad Hoc Committee Investigation or actions taken by the Company in connection with the Prior Ad Hoc Committee Investigation.

Sixth, with respect to the reversal of the 2016 bonus accrual, the Ad Hoc Committee has not discovered evidence of wrongdoing. The Board's process with respect to the accounting for bonus estimates and the reversal of the 2016 bonus accrual following the final bonus decisions in March 2017 were reviewed by its independent

Cory D. Holzer, Esq.
January 4, 2019
Page 5

accounting firm, KPMG, and KPMG signed off on the Company's first quarter and year-end 2017 financial statements.

Seventh, with respect to the identification of a material weakness in the Company's internal control over financial reporting, the Ad Hoc Committee has not discovered evidence of fraud committed or an improper benefit received by an officer or director in connection with the material weakness identified by the Company and KPMG. Additionally, although concerns were raised with respect to Steve Sugarman's actions regarding the Winston & Strawn Investigation, the October 18, 2016 Press Release, and changes in the reporting structure following the departure of the Company's former CFO, under the Separation Agreement, the Company has released Mr. Sugarman from claims it might bring based on these actions.

In sum, the Ad Hoc Committee has not discovered evidence supporting claims of Galanis' direct or indirect control of the Company or Company personnel or involvement of the Company or Company personnel in Galanis' fraudulent schemes. Nor has the Ad Hoc Committee discovered evidence of an action by a former or current Company director or officer that would fall within the limited scope of claims for fraud or improper benefit for which the Company can seek recovery under the exculpatory provision of the Company's Articles. And, the Company has released both former Chairman and CEO Steve Sugarman and former Executive Vice President and Vice Chairman Jeff Seabold from claims that might be brought, even if there were evidence to support such claims.

Further, should the Company pursue litigation against a present or former officer or director, in addition to incurring its own attorneys' fees and other litigation expenses, the Company would be required to advance the attorneys' fees and other litigation expenses of an officer or director defendant under the indemnity and advancement provisions of the Company's Articles. These costs would be on top of the distraction, expenditure of management time and other expenses that would accompany what the Ad Hoc Committee has determined would be unsuccessful litigation.

Therefore, given that the Company would probably lose any litigation it initiated, and incur significant litigation expenses, including paying attorneys' fees, the Ad Hoc Committee does not see the litigation proposed in the Gordon Demand Letter as being in the Company's best interest. Consequently, the Ad Hoc Committee recommended that the Company not pursue the claims alleged in the Gordon Demand Letter.

The Ad Hoc Committee also considered whether the Company should adopt remedial measures, including changes in corporate governance, as a result of the claims alleged in the Demand Letters. The Company implemented significant remedial measures based on the recommendations made following prior investigations and in remediating the material weakness in internal control over financial reporting. The Ad Hoc Committee has not identified any additional issues that would require further

Cory D. Holzer, Esq.
January 4, 2019
Page 6

remedial measures.  Given that those remedial measures, including governance changes, have been implemented over the last 18 months or so, the Ad Hoc Committee believes that it is in the best interest of the Company to proceed under the current governance structure and policies and procedures and continue to evaluate their effectiveness before implementing further changes.  Therefore, the Ad Hoc Committee did not recommend further remedial measures be implemented at this time.

On November 20, 2018, the Ad Hoc Committee presented its findings and recommendations to the full Board in a detailed 54-page written report, plus 53 exhibits (the "Report").  The Board considered and, on November 28, 2018, adopted the Ad Hoc Committee's Report, including the Ad Hoc Committee's findings and recommendations described above.

In reliance on the Ad Hoc Committee's Report, the Board has determined that it would not be in the best interest of the Company to pursue the claims alleged in the Gordon Demand Letter or implement any additional remedial measures at this time.

Sincerely,

Robert Sznewajs
Chair, Board of Directors

# EXHIBIT C

HOLZER & HOLZER, LLC

ATTORNEYS AT LAW

1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
770.392.0090 (ph)
770.392.0029 (fax)
888.508.6832 (toll free)
www.holzerlaw.com

January 24, 2019

Robert Sznewajs
Banc of California, Inc.
3 MacArthur Place
Santa Ana, CA 92707

Dear Mr. Sznewajs:

I write in response to your letter to me dated January 4, 2019.

With respect to the Board's formation of the referenced Ad Hoc Committee, please provide us the Ad Hoc Committee's report of its findings and recommendations to the Board together with all exhibits, interview notes, and all analyses regarding the independence of committee members. Also, please provide us the minutes and presentations from all Ad Hoc Committee meetings. In addition, please provide us the retainer agreement with Bergeson, LLP. Lastly, please also provide us the underlying releases and any other documents evidencing the company's agreements with any executives referenced in your letter, including the separation agreement with Steve Sugarman, as well as all documents upon which the Board relied to determine whether such agreements are enforceable.

Given all of these documents already have been gathered and are in your possession, we ask that you provide us all of these documents not later than close of business on Friday, February 1, 2019.

We reserve our rights to seek additional documents as the facts and circumstances warrant. Thank you in advance for your anticipated prompt cooperation in this matter.

Regards,

Corey D. Holzer

# EXHIBIT D



February 1, 2019

Corey D. Holzer, Esq.
Holzer & Holzer, LLC
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
cholzer@holzerlaw.com

*By E-Mail*

Re:    ***Your Correspondence Dated January 24, 2019***

Dear Mr. Holzer:

The Company declines to provide you the materials you have requested.


Sincerely,

Robert Sznewajs
Chair, Board of Directors

VERIFICATION

I, Kristopher Gordon, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE: 3/21/19

Kristopher Gordon

SWORN AND SUBSCRIBED
before me this 21 day of March, 2019.

Notary Public

Tatyana Robbs
NOTARY PUBLIC
Forsyth County, GEORGIA
My Commission Expires 09/17/2022