BRIAN J. ROBBINS (S.B.N. 190264)
CRAIG W. SMITH (S.B.N. 164886)
ASHLEY R. RIFKIN (S.B.N. 246602)
JONATHAN D. BOBAK (S.B.N. 312374)
ROBBINS LLP
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsllp.com
csmith@robbinsllp.com
arifkin@robbinsllp.com
jbobak@robbinsllp.com

*Co-Lead Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE BANC OF CALIFORNIA, INC. STOCKHOLDER DERIVATIVE LITIGATION | ) Lead Case No. 8:19-cv-00621-AG-DFM ) (Consolidated with Case Nos. 8:19-CV-1152 and 19-CV-05488) |
| This Document Relates To: | ) **VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** |
| ALL ACTIONS. | ) |
| | ) DEMAND FOR JURY TRIAL |

Plaintiffs Kristopher Gordon ("Gordon"), Donald Johnston ("Johnston"), and Colleen Witmer ("Witmer"), sometimes collectively referred to herein as "Plaintiffs," bring this shareholder derivative action on behalf of nominal defendant Banc of California, Inc. ("Banc" or the "Company"), a Maryland corporation. Plaintiffs' allegations are based upon personal knowledge as to Plaintiffs and on information and belief as to all other matters. Plaintiffs' information and belief is based upon the investigation conducted by and under the supervision of counsel which included, among other things, consultation with an accounting expert and a review and analysis of: (a) Banc's public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) articles in the news media and analyst reports; (c) the Company's website and press releases; (d) complaints and related materials filed in litigation commenced against the Company and certain of Banc's officers and directors by shareholders and former employees; and (e) applicable rules and regulations.

## NATURE OF THE ACTION

1.     Banc is a financial institution serving clients in California and the Western United States. On October 18, 2016, a post on SeekingAlpha.com (hereinafter "*SeekingAlpha*") by "Aurelius" entitled "BANC: Extensive Ties to Notorious Fraudster Jason Galanis Make Shares Un-Investible" alleged a web of improper and dangerous relationships between Jason Galanis ("Galanis"), a Los Angeles financier and convicted fraudster, and Banc's senior managers (the "Aurelius Blog").

2.     Banc publicly responded to the Aurelius Blog the same day, stating in a press release that it was already aware of the Galanis allegations, but that Banc's Board of Directors (the "Board"), acting through "[d]isinterested [d]irectors," had conducted an "independent" investigation of the matter "led by Winston & Strawn," an outside law firm. The press release also claimed that the Board had received "regular reports" on the progress of the investigation. Banc's press release went on

to discredit the allegations in the Aurelius Blog and denied the existence of ties between Galanis and Banc.

3.     On October 19, 2016, these denials were repeated and reinforced by Banc's General Counsel, defendant John C. Grosvenor ("Grosvenor"), in an investor conference call, in which he stated that, after becoming aware of potential issues concerning Galanis as far back as <u>2015</u>, "the Board of Directors determined to retain outside counsel to independently investigate the matters raised" of the Galanis allegations.  Defendant Grosvenor reiterated that the Board had received "results of that investigation" from Winston & Strawn during its review.  In addition, the October 18, 2016 press release was attached to a Form 8-K filed by Banc with the SEC on October 19, 2016, signed by defendant Grosvenor.

4.     These disclosures revealed that the Galanis allegations had been known to Banc, but hidden from shareholders, for approximately one year.  On or about October 27, 2016, Banc received an inquiry from its independent auditor, KPMG LLP ("KPMG"), raising questions about the potential involvement of Galanis in Banc's finances and operations, and the Company's response to the allegations in the Aurelius Blog.  Around that time, the Board created a purported Special Committee to investigate the alleged improper relationships and transactions.  The Special Committee included at least four board members who were themselves mentioned in the Aurelius Blog as having undisclosed conflicts of interest or other questionable associations.

5.     On January 23, 2017, Banc reported the Special Committee's conclusion that the Galanis allegations as they related to Banc were not true.  However, the Special Committee also reported that the October 18, 2016 press release describing its process itself "contained inaccurate statements."  Specifically, the Special Committee revealed that, contrary to that press release, Winston & Strawn's earlier investigation was not directed by "[d]isinterested" board members,

but by "management," that Winston & Strawn was not "independent" of Banc, and that the Board had not received "regular reports" of the investigation at all.

6.      Banc disclosed that its misleading October 18, 2016 response to Aurelius Blog post had triggered an SEC subpoena.  An SEC investigation was also commenced, captioned *In the Matter of Banc of California NY-09592*, which remains ongoing over two years later.

7.      Banc's officers and directors named herein have breached their duties to the Company in connection with the unfolding scandal at Banc.  These officers and directors authorized, endorsed, and/or failed to correct the Company's misleading October 18, 2016 press release and October 19, 2016 statements issued by and on behalf of the Board.

8.      In addition, Banc admitted in its Annual Report on Form 10-K for 2016 ("2016 Form 10-K"), filed with the SEC on March 1, 2017, that it suffered from material weaknesses of its internal controls in 2016, including an inappropriate "tone at the top," which weaknesses were, at all relevant times, the direct responsibility of management and the Board.

9.      Furthermore, by order dated September 6, 2017, U.S. District Judge Andrew J. Guilford of this Court sustained allegations that purchasers of Banc stock were defrauded by Banc's failure to disclose the alleged Galanis relationships in the Company's 2016 Proxy Statement.  *See In re Banc of California Securities Litigation*, No. SACV-17-00118 AG (ECF No. 68.)  According to the Court, the securities class action plaintiffs' allegations raised an inference that, in failing to disclose these alleged relationships to investors, Banc acted with scienter, or intent to defraud investors.

10.     These actions have severely damaged Banc.  After the Aurelius Blog posting, Banc plunged into chaos as a direct result of defendants' misconduct, including the active SEC investigation they precipitated, and the securities fraud litigation.  In addition, Banc was subjected to multiple lawsuits by former top

executives.  These executives allege that Banc's Board suffered from rampant conflicts of interest, and that Banc manipulated its accounting and issued false financial statements for 2016 and 2017 to prop up its results.

11.     As alleged herein, plaintiffs Gordon, Johnston, and Witmer made shareholder litigation demands ("Demands") on the Board to investigate these matters, and to take action to enforce the Company's claims against the wrongdoers.

12.     Each of the Demands were refused by a substantially similar letter dated January 4, 2019, written by defendant Robert Sznewajs ("Sznewajs"), Chairman of the Board, and himself a target of the allegations raised in the Demands (the "Rejection Letter").  Defendant Sznewajs wrote that an "Ad Hoc" Committee of three (3) directors (of the nine (9) member Board) had prepared a written report recommending to the Board that no claims be pursued. The Board had then "adopted" the "Ad Hoc" Committee's recommendations.

13.     Each plaintiff requested that the Board provide them with the "Ad Hoc" Committee's purported written report, and other supporting documentation, to substantiate the bases for the Rejection Letter.  In each case, defendant Sznewajs or Company counsel stated that the Board would not share the report or any other materials with Plaintiffs.

14.     As alleged herein, the Board's investigation was neither reasonable nor performed in good faith.  The Board's review process was structurally flawed from the outset.  The "Ad Hoc" Committee appointed to investigate Plaintiffs' Demands provided its report and recommendations to the full Board, which had the authority to vote on the proposed course of action.  The Board retained this authority, even though a majority of the Board members who voted (5 of 9) were directly implicated in the alleged wrongdoing set forth in the Demands.

15.     Then, the Board refused to share the written report with Plaintiffs while providing no justification, hiding its work from Plaintiffs and raising a strong inference that the "Ad Hoc" Committee's investigation was indefensible.

16.     Indeed, the Rejection Letter is rife with generalities and conclusory statements.  For example, the Rejection Letter states that the "Ad Hoc" Committee interviewed "multiple" witnesses, reviewed "multiple" documents and SEC filings, and reviewed witness deposition transcripts from other proceedings, but fails to identify any of these sources of information with particularity.  The Rejection Letter repeatedly states that the "Ad Hoc" Committee "discovered no evidence" of wrongdoing, while failing to describe any of the evidence at all.  It failed to analyze claims on a person-by-person, individual basis, and failed to account for the disastrous SEC investigation or the securities class action litigation.  Furthermore, the Rejection Letter fails to even respond to many of the specific issues raised in the Demands.

17.     The Board's flawed process and lack of diligence described herein supports the reasonable inference that its investigation was not the product of an independent review, that it was unreasonable, and that its decision-making process was not undertaken in good faith.  As a result, notwithstanding Banc's exposure to an ongoing SEC investigation and the disastrous consequences of defendants' misconduct, no fiduciary is being held to account.

18.     Plaintiffs' Demands were wrongfully refused and this action—which seeks to recoup the losses that Banc has sustained, and will sustain, in connection with the Galanis scandal and related fall-out—must now proceed.

19.     Banc's shareholders have been denied the benefits of loyal management by its executives and directors.  As described more fully below, Banc and its shareholders are entitled to monetary and injunctive relief to redress the defendants' bad faith conduct.

## JURISDICTION AND VENUE

20.     Banc is a corporation that conducts business and maintains its executive headquarters in this District.  The Individual Defendants (as defined below) have sufficient minimum contacts with this District to render the exercise

of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

21.     Jurisdiction is based on 28 U.S.C. § 1332(a)(2), there being diversity of citizenship between Plaintiffs and defendants because Plaintiffs, on the one hand, and the defendants, on the other, are citizens of different states.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) and (d). Further, a substantial portion of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

## THE PARTIES

23.     Plaintiff Gordon was a shareholder of Banc at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Banc shareholder.  Plaintiff Gordon is a citizen of Georgia.

24.     Plaintiff Johnston was a shareholder of Banc at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Banc shareholder.  Plaintiff Johnston is a citizen of Ohio.

25.     Plaintiff Witmer was a shareholder of Banc at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Banc shareholder.  Plaintiff Witmer is a citizen of North Carolina.

26.     Nominal defendant Banc is a Maryland corporation with its principal executive offices located at 3 MacArthur Place, Santa Ana, California.  Banc is a financial holding company that conducts business through its sole subsidiary, Banc of California, National Association, which operates thirty-two branch locations that provide core banking products and services to private businesses, entrepreneurs, and communities throughout California.  As of December 31, 2018, the Company had 741 full- and part-time employees. Banc common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BANC."  Nominal defendant Banc is a citizen of California.

27.     Defendant Halle J. Benett ("Benett") was a director of Banc from December 2013 until his "retirement" from the Board, as announced on November 7, 2019. At relevant times, defendant Benett served on Banc's Joint Audit Committee and Compensation, Nominating and Corporate Governance Committee. Defendant Benett knew about the internal investigation of alleged connections between Galanis and Banc officers and directors since at least 2015, which Banc failed to timely disclose.  He was also responsible for the October 18, 2016 press release by Banc that made false statements about the Board's Galanis investigation, triggering a subpoena from the SEC.  Banc paid defendant Benett the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $103,750 | $103,760 | - | $5,747 | $213,257 |
| 2017 | $136,555 | $103,750 | - | $7,919 | $248,224 |
| 2016 | $113,333 | $110,012 | - | $6,688 | $230,033 |
| 2015 | $110,000 | $90,008 | $19,999 | $4,551 | $224,558 |

Defendant Benett is a citizen of New York.

28.     Defendant Jonah F. Schnel ("Schnel") is a Banc director and  has been since April 2013.  Defendant Schnel is a member of the Joint Nominating and Corporate Governance Committee and has been since at least February 2017. Defendant Schnel was a member of the Joint Audit Committee from at least April 2015 to at least April 2016; and a member of the Joint Compensation, Nominating and Corporate Governance Committee from at least April 2015 to at least April 2016.   Defendant Schnel knew about the internal investigation of alleged connections between Galanis and Banc officers and directors since at least 2015, which Banc failed to timely disclose.  He was also responsible for the October 18, 2016 press release by Banc that made false statements about the Board's Galanis

investigation, which triggered a subpoena from the SEC.  Banc paid defendant Schnel the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $102,500 | $102,500 | - | $7,838 | $212,838 |
| 2017 | $134,147 | $102,500 | - | $10,986 | $247,633 |
| 2016 | $140,833 | $184,312 | - | $8,504 | $333,649 |
| 2015 | $130,000 | $110,000 | $19,999 | $5,563 | $265,562 |

Defendant Schnel is a citizen of California.

29.     Defendant Jeffrey Karish ("Karish") was a director of the Company from 2011 to 2018. At relevant times, defendant Karish served on Banc's Joint Audit Committee and Compensation and Human Capital Committee from at least April 2015 to May 2018.  Defendant Karish knew about the internal investigation of alleged connections between Galanis and Banc officers and directors since at least 2015, which Banc failed to timely disclose.  He was also responsible for the October 18, 2016 press release by Banc that made false statements about the Board's Galanis investigation, which triggered a subpoena from the SEC. Banc paid defendant Karish the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $41,667 | $344,401 | - | $3,354 | $389,422 |
| 2017 | $133,430 | $100,000 | - | $8,464 | $241,894 |
| 2016 | $124,167 | $110,012 | - | $7,349 | $241,528 |
| 2015 | $120,000 | $100,004 | $19,999 | $5,057 | $245,060 |

Defendant Karish is a citizen of California.

30.     Defendant Sznewajs was appointed as Chair of the Board in January 2017 after having served as a director since 2013.  Defendant Sznewajs serves as a Board designated "financial expert" and is a member of Banc's Joint Audit

Committee and Compensation and Human Capital Committee, and was the Chairman of the Joint Audit Committee from at least April 2015 to at least February 2017. Defendant Sznewajs knew about the internal investigation of alleged connections between Galanis and Banc officers and directors since at least 2015, which Banc failed to timely disclose. He was also responsible for the October 18, 2016 press release by Banc that made false statements about the Board's Galanis investigation, which triggered a subpoena from the SEC. Banc paid defendant Sznewajs the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $141,875 | $143,760 | - | $6,337 | $291,972 |
| 2017 | $172,904 | $140,000 | - | $8,737 | $321,641 |
| 2016 | $130,000 | $120,003 | - | $7,416 | $257,419 |
| 2015 | $120,000 | $100,004 | $19,999 | $5,057 | $245,060 |

Defendant Sznewajs is a citizen of Oregon.

31.     Defendant Eric L. Holoman ("Holoman") served as a director of the Company from July 2013 until June 2017. Holoman served on the Joint Compensation, Nominating and Corporate Governance Committee of the Board. Defendant Holoman knew about the internal investigation of alleged connections between Galanis and Banc officers and directors since at least 2015, which Banc failed to timely disclose. He was also responsible for the October 18, 2016 press release by Banc that made false statements about the Board's Galanis investigation, which triggered a subpoena from the SEC. Banc paid defendant Holoman the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $64,335 | $397,703 | - | $4,668 | $466,706 |
| 2016 | $130,000 | $120,003 | - | $7,416 | $257,419 |
| 2015 | $120,000 | $100,004 | $19,999 | $5,057 | $245,060 |

Defendant Holoman is a citizen of California.

32.     Defendant Chad T. Brownstein ("Brownstein") served as a director of the Company from May 2011 until February 2017.  Brownstein served on the Joint Compensation, Nominating and Corporate Governance Committee of the Board. Defendant Brownstein knew about the internal investigation of alleged connections between Galanis and Banc officers and directors since at least 2015, which Banc failed to timely disclose.  He was also responsible for the October 18, 2016 press release by Banc that made false statements about the Board's Galanis investigation, which triggered a subpoena from the SEC.  Banc paid defendant Brownstein the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $24,167 | $372,146 | - | $2,986 | $399,299 |
| 2016 | $182,917 | $180,041 | - | $9,684 | $372,642 |
| 2015 | $160,000 | $140,003 | $19,999 | $7,080 | $327,082 |

Defendant Brownstein is a citizen of California.

33.     Defendant Richard J. Lashley ("Lashley") is a Banc director and has been since February 2017.  Defendant Lashley is, and at all relevant times has been, a member of the Joint Audit Committee and the Nominating and Corporate Governance Committee and has been since at least February 2018.  Lashley is co-founder of PL Capital, LLC, and managing member of PL Capital Advisors, LLC, which owned 3,427,219 shares of Banc's common stock as of 2017.  Defendant Lashley knew about the improper bonus accounting used by Banc to inflate its

financial results for the first quarter of fiscal year 2017, as alleged herein.  Banc paid defendant Lashley the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $105,000 | $105,000 | $210,000 |
| 2017 | $87,937 | $105,000 | $192,937 |

Defendant Lashley is a citizen of California.

34.    Defendant Douglas H. Bowers ("Bowers") was Chief Executive Officer ("CEO") and a director of the Company from May 2017 through March 2019.  Banc paid Defendant Bowers the following compensation:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan | Other | Total |
|---|---|---|---|---|---|---|
| 2018 | $715,625 | - | $507,524 | $314,633 | $7,417 | $1,545,199 |
| 2017 | $424,242 | $500,000 | $1,157,975 | - | $154,634 | $2,236,851 |

Defendant Bowers is a citizen of California.

35.    Defendant Grosvenor was Banc's General Counsel and Corporate Secretary from 2012 until 2019.  Defendant Grosvenor made false statements to shareholders regarding the October 18, 2016 press release issued by Banc, as alleged herein.  Banc paid defendant Grosvenor the following compensation:

| Year | Salary | Bonus | Stock Awards | Stock Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2017 | $500,000 | - | $269,694 | - | $131,875 | $28,598 | $930,167 |
| 2016 | $501,378 | - | $400,045 | - | $200,000 | $34,431 | $1,135,854 |
| 2015 | $389,583 | $400,000 | $400,001 | $238,200 | - | $145,315 | $1,573,099 |

Defendant Grosvenor is a citizen of California.

36.    The defendants identified in ¶¶27-35 are sometimes collectively referred to herein as the as the "Individual Defendants."

# BOARD AND OFFICER DUTIES

**Duties of the Individual Defendants**

37.     Under Maryland law, each Individual Defendant owed and owes Banc and its shareholders fiduciary obligations and due care.  Each Individual Defendant was and is required to act in good faith, in a manner the director reasonably believes to be in the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.  Maryland law defines "act" to include an act, an omission, a failure to act, or a determination made not to act.

38.     To discharge their duties, Banc's officers and directors were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Banc were required to ensure the Company complied with its legal obligations and requirements, including complying with regulatory requirements by devising and implementing a system of internal controls sufficient to ensure the accuracy of Banc's financial statements and reporting.

39.     Banc's officers and directors were required to remain informed as to how Banc conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices as necessary to comply with applicable laws.

40.     The officers and directors were also required to comply with Banc's Code of Business Conduct and Ethics (the "Code"), which sets forth written standards that are designed to deter wrongdoing and to promote: (a) honest and ethical conduct; (b) avoid conflicts of interest, or the appearance of conflicts; (c) full, fair, accurate, timely and understandable disclosure in public communications; (d) compliance with laws, rules and regulations; (e) prompt

internal reporting of violations of the Code; and (f) accountability for adherence to the Code.

41.    Among the many requirements prescribed by the Code, the following are notable provisions, which the Individual Defendants ignored: (a) "The ethical management of both personal and business affairs is most important to all directors, officers and employees in order to avoid situations that might lead to a conflict, or even suspicion of a conflict, between personal interest and responsibility to the Corporation. *Your position should never be used directly or indirectly for private gain, for advancement of personal interests or to obtain favors or benefits for oneself, customers, or suppliers*"; and (b) "It is the Corporation's policy that directors, officers and employees may not engage in conduct which will conflict with the interests of the Corporation.  It is important to avoid even the appearance of a conflict of interest, since the appearance of a conflict of interest can be as damaging as an actual conflict, whether to the reputation of the Corporation or the individual."

42.    At relevant times, Individual Defendants Benett, Karish, Sznewajs, and Lashley served as Joint Audit Committee members, with Lashley as Chairman. The Joint Audit Committee is responsible for the integrity of the Company's financial statements and accounting practices, the accounting and financial reporting processes of the Company and the audits of the financial statements, the effectiveness of the Company's internal controls over financial reporting, and the Company's compliance with legal and regulatory requirements.

43.    The members of the Joint Audit Committee were required to comply with Banc's Audit Committee Charter.  Among other things, the Joint Audit Committee Charter expressly stated that the purpose of the Joint Audit Committee is to assist the Board of Directors in fulfilling its oversight responsibilities regarding, *inter alia*, the integrity of the corporation's financial statements and the corporation's compliance with legal and regulatory requirements.

44.    In connection with its oversight responsibility for the integrity of the Company's financial statements and the adequacy and reliability of disclosures to shareholders, the Joint Audit Committee members were, and are, responsible for conducting, among others, the following activities: (a) review and approve, prior to filing, the Company's Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K; (b) review and pre-approve, prior to release, all public communications issued by the Company; (c) review with the Board of Directors any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements; (d) review management's report on its assessment of the effectiveness of internal control over financial reporting as of the end of each fiscal year, and the independent registered public accounting firm's annual report on (i) management's assessment, and (ii) the effectiveness of internal control over financial reporting; (e) discuss with the independent registered public accounting firm the characterization and nature of any significant deficiencies or material weaknesses in internal control over financial reporting and any differences between management's assessment of the deficiencies and the independent registered public accounting firms.    The Joint   Audit Committee must also discuss with management its remediation plan to address any internal control deficiencies or weaknesses; (f) discuss with management and the independent registered public accounting firm, as of the end of each fiscal quarter, any changes in internal control over financial reporting that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting that are required to be disclosed; and (g) discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

45.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants aided and abetted and/or assisted each other in breaching their respective duties.

46.   During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (a) deceive investors and shareholders of Banc regarding the Individual Defendants' management of Banc's operations and connections with known criminals; and (b) enhance the Individual Defendants' executive and directorial positions at Banc and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

47.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue various improper statements.

48.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' breaches of fiduciary duty and unjust enrichment; and to conceal adverse information concerning the Company's operations, internal controls, financial condition, and future business prospects.

49.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual

Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

50.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## RELEVANT FACTUAL ALLEGATIONS

### A.    Background

51.    In 2010, Banc's predecessor entity, First PacTrust Bancorp, Inc. ("First PacTrust"), was struggling in the post-recession economy.  COR Capital LLC ("COR") helped contribute $60 million to revitalize the bank.  COR was owned and managed by Steven A. Sugarman ("Sugarman"), who joined First PacTrust's Board of Directors.  On September 21, 2012, Sugarman became First PacTrust's CEO.

52.    In July 2013, First PacTrust renamed itself Banc of California, Inc. and promoted itself as a "community investment leader."  Banc experienced phenomenal growth since 2010 as its assets grew to more than $10 billion.

### B.    The Aurelius Blog

53.    On October 18, 2016, *SeekingAlpha* published the Aurelius Blog entitled "BANC: Extensive Ties to Notorious Fraudster Jason Galanis Make Shares Un-Investable," written by an anonymous blogger known as Aurelius.  It claimed, among other things, that Banc directors Sugarman and Brownstein, along with another top executive, had certain ties to Galanis.  Galanis was a convicted felon with a reputation for looting public companies.

54.    The Aurelius Blog described Galanis' history of criminal conduct and provided links to source documents that included SEC complaints and criminal indictments.  Specifically, the Aurelius Blog alleged how, on September 24, 2015,

the U.S. Department of Justice ("DOJ") and the SEC charged Galanis with orchestrating multiple schemes to defraud investors.

55.     The Aurelius Blog alleged how, from 2009 to 2011, Galanis and others engaged in a scheme to defraud the shareholders of a publicly-traded company called Gerova Financial Group, Ltd. ("Gerova") by obtaining secret control over millions of shares of stock and then manipulating the market for the stock as the defendants caused their secretly held shares to be sold.

56.     As part of the scheme, Galanis fraudulently generated demand for Gerova stock by bribing investment advisers to purchase for client accounts the Gerova stock that was sold by Galanis and others, thereby enabling Galanis to cash out from the scheme and make millions in illegal profits.

57.     Galanis pled guilty to these charges in July 2016 and was sentenced to eleven years in prison in February 2017.

58.     In May 2016, while he was out on bail for the Gerova fraud, the DOJ and SEC again charged Galanis with securities fraud, this time in connection with a Ponzi scheme to defraud investors and a Native American tribal entity of tens of millions of dollars ("Tribal Bond Scheme").

59.     Galanis and other co-conspirators allegedly induced a Native American tribal entity to issue bonds based on lies about how the bond proceeds would be invested.  Galanis and the others pocketed the proceeds.  Galanis also allegedly defrauded investors into buying the bonds by hiding material facts. Galanis pled guilty to the Tribal Bond Scheme in January 2017.

60.     The Aurelius Blog alleged that Sugarman's COR and Galanis controlled the same offshore insurance company, Valor Group Ltd. ("Valor"), a Bermuda based holding company.  Valor and its subsidiaries were central to the Tribal Bond Scheme and were used by Galanis to carry out the fraud.  The Aurelius Blog alleged that a specific Valor subsidiary also played a role in the Tribal Bond Scheme, and was part of COR.

61.     In particular, COR entities were also accused of facilitating the Tribal Bond Scheme.   Specifically, Wealth-Assurance AG acted as Valor's primary insurance subsidiary, and Burnham Securities Inc. which maintained its headquarters in the same building as Banc, served as the placement agent for the bonds.   COR itself was listed by Galanis as a financial sponsor of the fraudulent bonds and references to COR's relationship with Banc appeared on documents used by Galanis to enhance his credibility with investors he was defrauding.

62.     Documents obtained by the SEC in its investigation of the Tribal Bond Scheme show that Galanis used his alleged connection with COR to demonstrate his financial backing to perpetrate the fraud.   During the Tribal Bond Scheme, Galanis also represented to his co-conspirators that he controlled companies associated with COR, including COR itself.

63.     The Aurelius Blog and accompanying documents also suggested that Sugarman held a majority interest in an entity named JAS Partners 1, LLC ("JAS Partners").   JAS Partners, along with another Banc executive, controlled Camden Capital Partners, LLC ("Camden").   According to the Aurelius Blog, Camden was used to finance Galanis during the Tribal Bond Scheme and was also utilized by Galanis during the Gerova securities fraud.

64.     In addition, the Aurelius Blog alleged ties between Galanis and defendant Brownstein.   In 2011, a private investment firm run by defendant Brownstein was a major investor in Prospect Global Resources, Inc. ("Prospect Global"), an entity which the SEC identified as a company Galanis controlled, and to which he funneled money obtained through his frauds.

65.     As far back as 2015, Banc's management knew of these supposed connections between the Company and the serial fraudster Galanis.   Indeed, the Company convened an internal investigation into Galanis' control over COR.   Through this investigation, Banc became aware of not only Galanis' troubled

1   history with white collar crime, but his use of Banc's goodwill and name in
2   furtherance of his schemes while running them from COR offices.

3       66.    Instead of making its findings public, Banc fiduciaries concealed the
4   impact of this internal investigation from shareholders at the expense of the
5   Company's integrity and reputation.

6       **C.    Banc Makes Multiple False Statements About the Aurelius Blog**

7       67.    In response to the disclosures in the Aurelius Blog, Banc quickly
8   issued a press release trying to contain the fallout.  Banc revealed in a press release
9   and investor call that, although it had never been disclosed, the Board had been
10  aware of the allegations for ***approximately a year***, but that an internal investigation
11  had not found them to be credible.

12      68.    The press release, issued on October 18, 2016—just hours after the
13  *SeekingAlpha* blog was published—included the following statements:

> Banc of California, Inc. today announced it is aware of allegations posted in a financial blog. The Company's Board of Directors has been aware of matters relating to Jason Galanis including certain claims he had made suggesting an affiliation with members of the Company, its Board, and/or its Executive team. ***The Board, acting through its Disinterested Directors, immediately initiated a thorough independent investigation*** led by Winston & Strawn, and has received regular reports including related to regulatory and governmental communications over the past year [emphasis supplied].

> The complaint filed by the Department of Justice against Mr. Galanis and others dated May 9, 2016 ... clearly states that Mr. Galanis' claims to be affiliated with COR Capital were fraudulent…. Banc of California and its Disinterested Directors will make further facts publicly available as appropriate.

25      69.    On October 19, 2016, the Company filed a Current Report on Form 8-
26  K with the SEC, which attached a copy of the October 18, 2016 press release.

27      70.    Also on October 19, 2016, the Company held an analyst conference
28  call to discuss its third quarter 2016 financial results.  Defendant Grosvenor

reaffirmed the statements contained in the Company's press release issued the day before that the Board's "independent" investigation found no evidence that Galanis exercised control over Banc or any of its directors.

71. Specifically, Grosvenor provided the following description of the Board's role in the prior investigation:

> As discussed in our press release yesterday, management first advised the Board of Directors in 2015 regarding the facts then known pertaining to the circumstances associated with Jason Galanis's indictment, including certain claims attributed to Galanis that he was affiliated in some manner with the Company or members of the Company's Board of Directors or management.

> In response, ***the Board of Directors determined to retain outside counsel to independently investigate the matters raised and report any information*** that might indicate the possible existence of any potential impropriety [emphasis supplied]. The results of that investigation, which has continued over the course of more than a year, failed to disclose any ownership interest by Galanis in the Company or the bank, and affirmatively confirmed that he exercised no direct or indirect control over the Company or the bank or any entity owned or affiliated with Steven Sugarman or any other member of the Board of Directors.

> The investigation also failed to disclose any past or present lending relationship between Galanis and the bank. In fact, the inquiry disclosed instances in which attempts by Galanis to establish a business relationship with the Company, presumably in furtherance of the fraudulent schemes for which he subsequently pled guilty, were unsuccessful.

> In that regard, the Company shared information developed in the course of its own investigation in cooperation with the government's prosecution of Galanis and others. That cooperation is evidenced by, among other matters, Paragraphs 40 and 41 contained in the affidavit submitted by the FBI's special agent in charge of the government's investigation as recited in the letter of Company counsel. As has been made clear, at least by reputable news organizations, none of the Company or the bank or any member of the Board of Directors or

management has been the subject of the government's prosecution of Galanis.

Finally, in response to the allegations contained in the Seeking Alpha post and ***at the direction of the disinterested members of the Board***, Company counsel has made written demand, a copy of which is included in our filing this morning, for the immediate removal and a written retraction of the article [emphasis supplied]. In addition, the Company has been advised by its counsel that the demonstrably egregious nature of the defamatory statements constitutes actionable libel per se, and the Company intends to vigorously pursue all of its legal remedies.

As a result, on the advice of counsel and in order to preserve our rights, we are not going to discuss any further specifics about Galanis during today's call while our formal demands for removal and a retraction of the article are pending. We will provide periodic public updates and further information as additional developments occur.

72.     At the time each of these statements describing the Board's purported process and decision-making on how to handle the Galanis issues, defendants Sznewajs, Benett, Schnel, Karish, Holoman and Brownstein were each members of the Board.

73.     Given the prominence with which the Company disclosed the Board's purported investigation and findings, in which included via a press release, an investor conference call, and a Current Report on Form 8-K, and given that the disclosures describe the Board's knowledge and actions, these directors knew that the October 18, 2016 press release falsely conveyed the true extent and nature of the Board's prior investigation into possible relationships between Galanis and corporate insiders.

74.     Defendant Grosvenor, as General Counsel for Banc, likewise knew or recklessly disregarded that the statements about the Board's actions and the "independence" of Winston & Strawn were false, as that law firm had previously represented Banc and Sugarman.

75.     On October 27, 2016, Banc's independent auditor, KPMG, which had not previously been advised of the Winston & Strawn investigation related to Galanis, sent defendant Sznewajs a letter "raising concerns about allegations of 'inappropriate relationships with third parties' and 'potential undisclosed related party relationships.'"  The Company formed a Special Committee of directors to investigate the allegations raised in the *SeekingAlpha* report.

76.     The Special Committee initially consisted of defendants Schnel, Karish, Benett, Sznewajs, and Holoman, who left the Special Committee before it concluded its work.  Banc represented to investors that each of these directors was "independent" for the purpose of the investigation.  However, each director was conflicted from the outset, because, among other things, the Aurelius Blog contained allegations against them as well.

77.     For example, the Aurelius Blog alleged that (a) defendant Schnel was a partner of defendant Brownstein, and the two had co-founded a company; (b) defendant Karish was a director at Digital Turbine with an in-law of Sugarman; (c) defendant Benett was an investment banker with Keefe, Bruyette & Woods ("KBW") which had been "paid millions by BANC as underwriter of securities offerings;" and (d) defendant Sznewajs was previously the CEO of West Coast Bank, which received a cease and desist order from regulators in 2009 due to "management whose policies and practices are detrimental to the bank."

78.     On November 10, 2016, Banc filed a Notification of Late Filing/Form 12b-25 on Form NT 10-Q with the SEC that revealed the formation of the "Special Committee of Independent Directors" on October 27, 2016, to review "certain purported improper relationships and related party transactions and related matters."  The Form NT 10-Q provided no information about the composition of the committee or relationships that were being reviewed.

79.     In the Form NT 10-Q, Banc stated that it was unable to file its quarterly report because of the Special Committee's ongoing investigation:

[The Company] is delaying the filing of its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2016 ... at this time to allow for completion of a review into certain purported improper relationships and related party transactions and related matters. The review includes an investigation by independent legal counsel having no prior relationship with the Company or its officers and directors under the direction of a Special Committee of Independent Directors, which was established by the Board of Directors on October 27, 2016.

80.     On December 27, 2016, Banc announced that defendant Benett would not stand for re-election as a director of the Company at the 2017 shareholder meeting.  Defendant Benett indicated that his decision not to stand for re-election was for personal reasons, based upon his assessment of the demands of his business activities and employment.

81.     On January 23, 2017, Banc issued a press release disclosing that the Company's October 18, 2016 press release downplaying the Galanis allegations contained statements regarding the Board's conduct that were not true.  In addition, Banc disclosed that it had become the subject of an investigation by the SEC, a fact which had gone undisclosed for almost two weeks.

82.     In relevant part, the January 23, 2017 press release stated:

On October 18, 2016, an anonymous blog post raised questions about related party transactions and other issues with respect to the Company. As previously disclosed, in response to these allegations, the Board formed a Special Committee which commenced a process to review the allegations. Shortly thereafter, on October 27, 2016, the Company's independent auditor, KPMG, sent a letter to Mr. Sznewajs in his capacity as Chair of the Company's Joint Audit Committee (the "KPMG Letter") raising concerns about allegations of "inappropriate relationships with third parties" and "potential undisclosed related party relationships."

On October 30, 2016, the Special Committee retained WilmerHale, a law firm with no prior relationship with the Company, to conduct an independent investigation to address certain issues raised by the blog

post, as well as questions raised by the KPMG Letter. In accordance with the KPMG Letter, WilmerHale will make a final report to the Special Committee and KPMG on the results of its investigation. The Special Committee expects that this final report will take place within weeks.

While certain work remains to be completed, to date WilmerHale's inquiry has not found any violation of law. In addition, contrary to the claims in the blog post, the inquiry has not found evidence that Jason Galanis has any direct or indirect control or undue influence over the Company. Furthermore, the inquiry has not found evidence establishing that any loan, related party transaction, or any other circumstance has impaired the independence of any director.

Through the inquiry, however, the Special Committee has determined that a press release issued on October 18, 2016 contained inaccurate statements. ***In that press release, the Company stated that the "Board of Directors, acting through its Disinterested Directors" had, as of October 18, 2016, investigated issues raised in the blog post. This press release was inaccurate in certain respects. The review established that although an investigation had been conducted, it was not initiated by the Board of Directors; rather, it appears to have been directed by Company management rather than any subset of independent directors. In addition, the press release characterized the investigation as "independent" without disclosing that the law firm conducting the investigation had previously represented both the Company and the Company's CEO individually. Furthermore, the press release stated that the Board or a group of "Disinterested Directors" had received "regular reports including related to regulatory and governmental communications." This overstated both the degree to which the Company had been in contact with regulatory agencies about the subject matter referenced in the blog post, as well as the involvement of the directors in oversight or direction of the inquiry***.

Related to this matter, on January 12, 2017, the Securities and Exchange Commission ("SEC") issued a formal order of investigation directed at certain of the issues that the Special Committee is reviewing. Also on January 12, 2017, the SEC issued a subpoena seeking certain documents from the Company, primarily relating to the October 18, 2016 press release and associated public statements. The Company

intends to fully cooperate with the SEC; in addition, the Special Committee will share the results of its review with the SEC staff.

83.     In a separate press release issued the same day, Banc announced Sugarman's resignation from all positions with the Company.  He was replaced as Chairman by defendant Sznewajs, and the Company announced a convoluted interim executive structure, as follows:

> The Office of the CEO/President will be composed of Hugh Boyle, Chief Risk Officer, who will additionally assume the title of Interim Chief Executive Officer, and J. Francisco A. Turner, Chief Strategy Officer and Principal Financial Officer. Mr. Turner will partner with Mr. Boyle and assume the title of Interim Chief Financial Officer and President.

84.     On this news, Banc's shares fell $1.50, or nearly 10 percent.

85.     On February 9, 2017, the Company issued a press release announcing that "WilmerHale has made a final report to the Special Committee ... and has confirmed its earlier conclusion that the inquiry has not found any violation of law." The investigation concluded that Galanis had no indirect or direct control or undue influence over the Company and that no loans or related party transactions had impaired the independence of any director.

86.     The directors on the Special Committee (including, at least, defendants Schnel, Sznewajs, Benett, Holoman, and Karish) were directly responsible for, and undoubtedly aware of, the contents of the misleading October 18, 2016 press release when it was issued.  Yet none of the Special Committee members were themselves held accountable for the false statements, nor was defendant Grosvenor, who repeated the falsehoods on the October 19, 2016 investor call, and signed the Current Report on Form 8-K by which the October 18, 2016 press release was filed with the SEC.

87.     These breaches of disclosure by the members of the Special Committee and defendant Grosvenor led directly to a subpoena by the SEC.

### D.      The Securities Class Action

88.      On January 23, 2017, a securities fraud class action lawsuit was filed in this Court on behalf of purchasers of Banc's securities, based on allegations that Banc, Sugarman, and another executive named James J. McKinney made false and misleading statements to Banc investors in connection with the Galanis allegations.

89.      In an amended complaint filed on May 31, 2017, the lead plaintiff alleged that the defendants (a) omitted material information from their public statements about numerous connections Banc officers and directors had with Galanis; (b) misled investors about the independence of Banc's "disinterested directors" in its SEC filings in connection with their approval of related-party transactions; and (c) failed to disclose that Banc's management was conducting an ongoing internal investigation into the Company's ties with Galanis. In the amended complaint, the lead plaintiff specifically alleged that the Company's October 18, 2016 and October 19, 2016 statements were false and misleading.

90.      In an order denying the motion to dismiss dated September 6, 2017, the Court held that the lead plaintiff adequately alleged a material omission in the 2016 Proxy Statement, and that defendants had acted with scienter.

91.      On May 31, 2018, Judge Guilford certified the class, defined as "All persons and entities who purchased or otherwise acquired the common stock of Banc of California, Inc. ("Banc" or the "Company") during the period from April 15, 2016 through January 20, 2017, inclusive (the "Class Period"), and were damaged thereby.  Excluded from the Class are Defendants, present or former executive officers and directors of Banc and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii))."  The order certifying the class exposed the Company to massive liability.

92.      On October 30, 2019, the lead plaintiff filed a motion for preliminary approval of a settlement of the securities class action for a payment to the certified class of $19.75 million.

**E.      The Company Admits Internal Control Deficiencies**

93.      Notably, in its Quarterly Report on Form 10-Q filing for the quarter ended September 30, 2016, filed on March 1, 2017 with the SEC, Banc admitted that it suffered from material weaknesses in its internal controls in the wake of the Aurelius Blog scandal.  According to the Form 10-Q:

> Based on this evaluation, management concluded that the disclosure controls and procedures were not effective as of September 30, 2016 due to a material weakness in the design and operating effectiveness of our internal control over financial reporting as it relates to our control environment. As defined in SEC Regulation S-X, a material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. We determined that an inadequate tone at the top regarding the importance of internal control over financial reporting gave rise to the material weakness. Specifically, the Company's tone at the top did not appropriately prioritize the Company's internal control over financial reporting which has not been sufficient to address new and evolving sources of potential misstatement largely driven by the increased complexity and growth in the size and scale of the business. This ineffective tone at the top adversely impacted a number of processes resulting in an ineffective risk assessment process, ineffective monitoring activities, and insufficient resources or support which caused the Company to experience an increase in the number of control deficiencies across multiple processes. As a result, even though no material misstatement was identified in the financial statements, it was determined that there was a reasonable possibility that a material misstatement in the Company's financial statements would not have been prevented or detected on a timely basis.

94.      In addition, in its Annual Report on Form 10-K filing for 2016, also filed with the SEC on March 1, 2017, Banc's auditor stated that Banc suffered from material weaknesses in its internal controls and from a "number of control deficiencies across multiple processes."  According to the auditor, Banc "has not maintained effective internal control over financial reporting as of December 31,

2016, based on criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)."

95. Banc's lack of controls permitted defendants to conceal the alleged ties between Galanis and Banc's officers and directors, including the Board's undisclosed investigation thereof. Banc's subsequent remedial actions demonstrate the abject state of its internal controls in 2016.

96. Each of the defendants who served as an officer or director during fiscal year 2016 was responsible for the Company's failed internal controls, which contributed directly to the wrongdoing alleged herein, and which gave rise to the SEC investigation, and the securities class action.

**F.    Banc Manipulates Bonus Accounting**

97. As the Aurelius Blog scandal engulfed Banc, Banc's new management, with approval of the Joint Audit Committee, sought ways to artificially inflate Banc's first quarter 2017 financial results to maintain Banc's credibility in the market. This is alleged in detailed wrongful termination suits filed by two former Banc executives with alleged particularized knowledge regarding the disputed accounting, Jeffrey T. Seabold ("Seabold"), former Executive Vice President and Chief of Staff, and Heather Endresen ("Endresen"), former Managing Director of SBA Lending, and borne out in Banc's reported earnings.

98. Seabold alleged that to implement this plan, Banc initiated a so-called "reassessment" for accruals for 2016 bonuses. This resulted in reversing $7.8 million in such accruals, which were then credited toward liabilities accrued in the first quarter of 2017, resulting in increased earnings for the first quarter of 2017. Endresen likewise claimed that as early as January 2017, she was informed that Banc had decided to scale back the Company bonus pool, and consequently, certain employee bonuses would be reduced. She expressed her disagreement to then Joint

Audit Committee Chairman, defendant Lashley, on the justification and validity of the bonus reversal, which shifted over $7 million in earnings from 2016 to 2017.

99.     The improper bonus accounting alleged by Seabold and Endresen is evident in Banc's filed financial statements for the relevant periods.  For the three years ended December 31, 2016, Banc's net income had grown by an average of approximately 95.72% per year.  Banc's quarterly net income for the year ended December 31, 2016 averaged approximately $29 million.  By comparison, Banc reported net income of just $17.2 million for the quarter ended March 31, 2017, approximately 50% below earnings reported for the fourth quarter of 2016.

100.    Based on disclosures in Banc's March 31, 2017 financial statements, filed with the SEC on May 10, 2017, Banc reversed approximately $7.8 million of accrued incentive compensation that had been recorded as a liability at December 31, 2016, and had been recognized as an expense in Banc's financial statements for the year ended December 31, 2016, recording the reversal as a reduction in first quarter 2017 compensation expense.

101.    Banc's first quarter 2017 Quarterly Report on Form 10-Q described the reversal as follows: "At December 31, 2016 the Company accrued a liability for estimated discretionary incentive compensation payments to certain employees. The amount paid was less than the accrued liability.  Consequently, the Company reversed the excess accrual and recorded a credit to salaries and employee benefits on the consolidated statements of operations of $7.8 million during the three months ended March 31, 2017.  The reversal, based on new information driven by changes to certain facts and circumstances, was determined to be a change in estimate."

102.    The effect of the reversal was to increase Banc's pre-tax earnings for the quarter ended March 31, 2017 by approximately $7.8 million, representing <u>48%</u> of Banc's reported pre-tax earnings for the first quarter.  The reversal represented approximately 5.2% of Banc's reported pre-tax income for the year ended December 31, 2016.  The reversal had a material effect on Banc's December 31,

2016 and March 31, 2017 financial statements, though the relative effect was far greater on the first quarter 2017 financial statements.[1]

103.   Banc reported earnings per share on a fully diluted basis of $0.23 for the first quarter of 2017.  Remarkably, approximately $0.15 of this amount was the direct result of the disputed reversal of the 2016 accrued incentive compensation.  In other words, without the disputed reversal of the 2016 accrued incentive compensation, Banc would have reported just $0.08 in diluted earnings per share for the quarter ended March 31, 2017, compared with earnings per share of $0.52 reported for the prior quarter ended December 31, 2016.

104.   The price of Banc's shares had declined significantly beginning in the fourth quarter of 2016 and continuing into 2017.  From August 2016 through October 2016 the share price fell from $22 per share to $13 per share.

105.   Significant drops in earnings and share prices provide a strong incentive for management to take drastic actions to improve earnings and share prices, including intentional misapplications of U.S. generally accepted accounting principles ("GAAP").

106.   Expenses must be recognized in the periods in which they are incurred, when the benefits associated with cost have been exhausted.  Liabilities represent likely future payments resulting from past transactions or events.  Thus, bonuses to be paid for services rendered by employees to Banc during the year ended December 31, 2016, were required to be recognized in the 2016 financial statements.

107.   The Notes to Banc's financial statements for the year ended December 31, 2016, acknowledge that its financial statement amounts were based on estimates

---

[1] Materiality is generally defined based on whether an amount is expected to influence the decisions of users of the financial statements.  As a rule of thumb, the quantitative benchmark for publicly held entities generally ranges from 5% to 10% of reported net income.

and assumptions based on available information.[2]  Accounting estimates are an approximation of an amount included in the historical financial statements as of a certain date.  Accounting estimates measure the effects of past transactions or events.  In the case of bonus accrual, the past transaction was the service rendered by employees prior to the December 31, 2016 balance sheet date.  Estimates must be measured based on the most likely outcome.

108.   Having prepared its financial statements for the year ended December 31, 2016, Banc was required to consider whether subsequent events, including a likely reduction in 2016 bonus amounts, provided additional evidence about conditions existing at the date of the balance sheet, including the estimates inherent in its preparation of the financial statements.  For SEC filers, subsequent events must be evaluated through the date that the financial statements are issued.

109.   Because it is a public company, for purposes of evaluating the reasonableness of the estimated accrued incentive compensation recorded in Banc's records as of December 31, 2016, management was required to evaluate and consider all information that was available through March 1, 2017, the date that Banc's 2016 financial statements were filed with the SEC.

110.   If, based on the information available to Banc management on March 1, 2017, management believed it was reasonably possible that some or all of the incentive compensation bonuses initially accrued at December 31, 2016 would not be paid, the amounts accrued as of December 31, 2016 should have been adjusted to the amounts reasonably expected to be paid with a corresponding adjustment to the December 31, 2016 financial statements prior to filing the financial statements with the SEC, rather than recognizing the change in the financial statements for the quarter ended March 31, 2017.

111.   During the two month period following December 31, 2016, Banc's Board would have been fully aware of the expected significant decline in first

---

[2] *See* Banc of California, Inc., Annual Report (Form 10-K), at 107 (Mar. 1, 2017).

quarter earnings and earnings per share relative to the reported earnings for the quarter ended December 31, 2016, and the continuing decline in the price of Banc's shares.  During this same period, Banc was also struggling with the allegations of wrongdoing related to the Aurelius Blog post in October 2016, and the announcement of the SEC investigation in January 2017.

112.   These conditions created a strong incentive to take actions to bolster first quarter 2017 earnings.  On or prior to March 1, 2017, two full months after year-end, the Board knew of the likely reduction of any accrued but unpaid 2016 incentive compensation and was required by GAAP to adjust the amount accrued in the December 31, 2016 financial statements to the amount reasonably expected to be paid, based on information available at March 1, 2017.

113.   Banc's actions in reversing the accrued 2016 incentive compensation and recognizing the reversal as an increase in <u>first quarter of 2017</u> earnings (rather than an increase in <u>year-end 2016</u> earnings) represented an intentional misstatement of Banc's financial statements for the year ended December 31, 2016 and quarter ended March 31, 2017.

114.   Even Banc's 2017 Derivative Proxy Statement on Schedule 14-A, filed on April 28, 2017, admits that certain bonus reductions were made for 2016 "in light of the extraordinary challenges faced by the Company <u>in late 2016 and early 2017</u>"—events which occurred well before March 1, 2017 when the 2016 Form 10-K was filed, in which the effect of these reversals should have been disclosed.

115.   Banc's reduction of incentive based compensation for 2016 is further highly dubious in light of the Company's reported performance in 2016, which it described in a January 30, 2017 press release as a "record" year in which Banc "exceeded each of our stated financial targets."

116.   Based on the information available to management and the Board, Banc's fiscal year 2016 financial statements included in its Annual Report on Form 10-K, which should have been adjusted to reduce the accrued incentive

compensation as of December 31, 2016 resulting in an increase in earnings for the fourth quarter of 2016, rather than shifting the income to the first quarter of 2017.

117.   The 2016 Form 10-K was filed on March 1, 2017, and was signed by defendants Lashley, Benett, Karish, Schnel and Sznewajs.  Banc's first quarter 2017 Quarterly Report on Form 10-Q disclosing these false and misleading financial statements was filed on May 10, 2017, and was signed by defendant Bowers.

118.   At the time of the Form 10-K filing, the Joint Audit Committee consisted of defendants Lashley, Benett, Karish and Sznewajs.  At the time of the Quarterly Report on Form 10-Q filing, defendant Bowers was serving as CEO and a director.

119.   Given the materiality and impact of the wrongful accrual accounting on reported results for fiscal year 2016 and the first quarter of fiscal year 2017, each of these defendants and defendant Schnel knew or recklessly disregarded the false and misleading nature thereof.

**G.   Executives Allege Further Rampant Wrongdoing**

120.   In addition to the manipulation of bonus accounting, Seabold alleges that Banc's new leadership brought in after Sugarman's departure eliminated transparency in financial reporting and budgeting processes, turning off Sarbanes-Oxley Act ("SOX") compliance reports to management.   Seabold alleged that Special Committee members defendants Sznewajs, Benett, Karish, and Schnel engaged in a "power grab" seeking a scapegoat in Sugarman and defendant Brownstein for their own conflicts and transactions.   Seabold asserts that these Board members sought to push out Company whistleblowers, officers, and directors that sought to ensure compliance with disclosure and financial reporting requirements.

121.   Seabold also asserts that defendant Karish had connections to defendant Brownstein while he was employed at Heritage Group, an investor in a business owned by defendant Brownstein.  Seabold further alleges that defendant

Karish served on a board of directors of a company alleged of fraudulent business practices, a fact not disclosed to Banc's Board.   Whistleblowers disclosing defendant Karish's connections to prior breaches of fiduciary duties were pushed out of Banc.

122.   Seabold likewise claims that defendant Sznewajs suffers from conflicts of interest.  Despite serving as the Chairman of the Joint Audit Committee, Seabold states that defendant Sznewajs did not disclose to the Company that his committee approved the hiring of his son's firm to underwrite a Company offering.

123.   Endresen alleges that she encountered similar resistance to ensure effectiveness of Banc's internal controls. For example, Endresen claims she met with interim CEO Hugh F. Boyle ("Boyle"), Director of Human Resources Michael Urtel, Chief Internal Audit Officer Michael Gelormino ("Gelormino"), and defendant Lashley about the Company's SOX violations.

124.   In response, Endresen claims she was deprived of her bonus and subject to a culture of fear and retaliation that forced her from her position. Additionally, Endresen alleges that Banc inserted Francisco A. Turner ("Turner") as Interim President and Chief Financial Officer, who consistently violated SOX and the Company's Code of Business Conduct and Ethics.

125.   Among the shocking allegations, Endresen claims that Turner was not only involved in the accounting manipulation described above, but misused Company funds to pay for employees, clients, and analysts to go to strip clubs. Turner's toxic "tone at the top" included use of drugs and sexual activity at work, according to Endresen.

126.   Both Seabold and Endresen also allege that those responsible for the illegal activity, including Boyle and Turner, were rewarded with promotions instead of disciplined.  Some of these individuals still hold top positions with the Company, including defendant Sznewajs as Banc's Chairman of the Board.  Seabold's claim was later settled for $4.3 million.

## <u>DAMAGES TO THE COMPANY</u>

127.    Banc has suffered, and continues to suffer, from the Individual Defendants' wrongdoing described herein.

128.    Banc hid the Galanis allegations from shareholders for approximately a year.  When confronted with the Aurelius Blog, Banc then disseminated the October 18, 2016 press release and made statements falsely describing the Company's purported investigative process.  These false statements, made by the Board, or made in its name, and which the directors failed to timely retract or correct, contributed directly to a subpoena from, and an investigation by, the SEC, a highly damaging event for a public company.

129.    The Individual Defendants' improper statements, failure to maintain adequate internal controls, and the Board's flawed response to the allegations of impropriety regarding Galanis have severely impacted Banc's credibility. Furthermore, as a direct and proximate result of the Individual Defendants' actions, Banc has expended, and will continue to expend, significant sums.

130.    Such expenditures include costs incurred from responding to the ongoing SEC investigation, and defending and settling other related claims, including the securities class action.  Indeed, the Company's most recent Annual Report on Form 10-K filing, filed with the SEC on March 1, 2019, Banc states as follows:

> On January 12, 2017, the Company received a formal order of investigation issued by the SEC and a subpoena seeking documents primarily related to certain of the issues that the Special Committee reviewed. The Company has been fully cooperating with the SEC in this investigation.
>
> The SEC investigation could lead to the institution of civil or administrative proceedings against the Company as well as against individuals currently or previously associated with the Company. Any such proceedings or threatened proceedings might result in the imposition of monetary fines or other sanctions against the named parties. Resulting sanctions could include remedial measures that might

prove costly or disruptive to our business. Additionally, as discussed under Item 3 in Part I of this Annual Report on Form 10-K, a consolidated class action lawsuit was filed against the Company on January 23, 2017, and other lawsuits have been filed against the Company by former officers and others. In addition to the risk of fines, sanctions, or monetary judgments, the SEC investigation and lawsuits may cause the Company to incur significant attorneys' fees, both with regards to counsel representing the Company and with regards to indemnity obligations incurred by the Company.

The pendency of the SEC investigation and any resulting litigation or sanctions, as well as the pending lawsuits (or any other lawsuits) could harm our reputation, leading to a loss of existing and potential customers, and our ability to attract and retain deposits and greater difficulty in securing financing or other developments which could adversely affect our liquidity, financial condition and future operating results.

131.   Notwithstanding these admitted, material adverse impacts and continuing risks to the Company, the Board has done nothing to seek recovery from the individual wrongdoers.

132.   Plaintiffs seek to remedy the foregoing harm through the recovery of monetary damages and implementation of corporate governance reforms.

## DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

133.   Banc is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

134.   Plaintiffs will adequately and fairly represent the interests of Banc in enforcing and prosecuting its rights and has hired experienced counsel.  Plaintiffs were shareholders of Banc at the time of the wrongdoing, have continuously been shareholders since that time, and are currently shareholders.

135.   As alleged below, Plaintiffs each made Demands on the Board to investigate and pursue claims on the Company's behalf.

136.   The Board had an affirmative duty under Maryland law to conduct a reasonable, objective, and good faith investigation into the allegations in response to Plaintiffs' Demands, and to determine on the basis of that investigation whether the Demands' factual allegations and legal claims have merit and whether pursuing the claims in litigation would be in the Company's best interests.  The Board failed in this duty.

### A.   Plaintiff Gordon's Demand

137.   On July 3, 2018, plaintiff Gordon demanded, among other things, that Banc's Board immediately commence an investigation into allegations of misconduct by certain current and former officers and directors of Banc ("Gordon Demand").  Exhibit A.

138.   Among other things, the Gordon Demand insisted that this investigation be conducted by independent Board members who are not implicated in the allegations of wrongdoing identified in the Gordon Demand, or named as a defendant in any related litigation arising from, or related in any way to, the Aurelius Blog, its contents, or Banc's response thereto.

139.   The Gordon Demand specifically requested that the Board determine: the extent of the Galanis relationships and whether any such relationship  was adequately disclosed; whether any Board member was responsible for the content of the October 18, 2016 press release that the Special Committee later found to include inaccurate statements; what harm Banc has suffered, either monetarily or to its reputation, from the issuance of the October 18, 2016 press release and follow up investigation; what improvements in Banc's internal controls would have reduced the chance of false and misleading statements being issued, including but not limited to statements contained in Banc's 2016 Proxy Statement and the October 18, 2016 press release; whether members of the Joint Audit Committee submitted full and accurate information to Banc's auditor when justifying the reassessment of accruals for certain executives in the first quarter of 2017; and

whether there was any improper motive in reassessing the bonuses for certain executives in the first quarter of 2017.

140.   The Gordon Demand also obligated the Board to identify who would conduct the investigation, whether outside counsel was retained (and the identity of any such counsel), and the scope of their investigative authority. The Gordon Demand further demanded improvements to Banc's corporate governance.

141.   The Gordon Demand was refused by the Rejection letter dated January 4, 2019.  Exhibit B.  According to the Rejection Letter, an "Ad Hoc"  Committee had been formed to review the Gordon Demand, consisting of three (3) directors who joined the Board post-Aurelius Blog revelations.  However, the Rejection Letter was not written by any such committee member, nor by the committee's counsel.  Instead, the Rejection Letter was written by an interested director— defendant Sznewajs.

142.   The Rejection Letter made clear that the "Ad Hoc" Committee was not vested with authority to independently advance or dispose of any claims.  Instead, it was formed only to make a recommendation to the Board for a vote, even though a majority of the Board members (5 of 9) were directly implicated in the allegations plaintiff Gordon demanded that the Board investigate.

143.   In particular, defendants Sznewajs, Benett, and Schnel are themselves personally mentioned in the Aurelius Blog.

144.  In addition, they served on the Board during 2016, when: (a) the allegedly false and misleading Proxy Statement at issue in the securities class action was filed with the SEC; (b) the Board (which included each of them) was withholding from shareholders, Banc's auditors and the SEC that the Board had been aware of and investigating the Galanis allegations since 2015; (c) the Board (which included each of them) issued the misleading October 18, 2016 press release, which was admittedly untrue and led to a subpoena from the SEC; and (d) the Company maintained failing internal controls, which were directly within

the purview of the Board's oversight responsibility.  Defendants Sznewajs, Benett and Schnel also personally signed the 2016 Form 10-K with the disputed, allegedly manipulated financial results regarding improper bonus accounting.

145.   Defendant Lashley was personally involved in the alleged improper bonus accounting, and, along with defendant Bowers, signed the disputed SEC filings.  Furthermore, defendant Bowers was not independent because he was the full-time CEO of Banc, and reliant on other directors for his position and compensation.

146.   Thus, a Board majority (5 of 9) was not entirely disinterested.  Instead, a majority of the Board was personally involved in the disputed conduct, and should have been isolated from the demand review process, but instead they controlled the outcome.  This confirms that the self-interest of the decision-makers was prioritized over the substance of the Gordon Demand response.  This alone demonstrates that the Board did not act independently, and that its investigation was not reasonable nor in good faith.

147.   According to the Rejection Letter, the "Ad Hoc" Committee of the Board hired Bergeson, LLP ("Bergeson") to investigate the Gordon Demand.  However, the "Ad Hoc" Committee and Bergeson gave way to defendant Sznewajs, who personally prepared the Rejection Letter on Company letterhead.  Plainly, neither the "Ad Hoc" Committee nor its counsel were authorized to exercise the Board's authority, or even speak for the Board on the issues with which they were tasked.

148.   According to the Rejection Letter, the "Ad Hoc" Committee allegedly met seven times to direct, review, and consider the investigative work conducted by its counsel, and worked with counsel to prepare a report of its findings and recommendations.  Ostensibly in reliance upon "a detailed 54-page report, plus 53 exhibits" presented to the Board on November 20, 2018, the Rejection Letter stated that "the Board has determined that it would not be in the best interest of the

Company to pursue the claims alleged in the Gordon Demand Letter or implement any additional remedial measures at this time."

149.    According to the Rejection Letter, the "Ad Hoc" Committee provided its purported report and exhibits to the Board on November 20, 2018, yet only eight days later (a span of time that included a four day long holiday weekend), the Board "adopted" the report of the "Ad Hoc" Committee.  No Board could have in good faith analyzed the contents of the purported 54-page report and 53 exhibits and made an informed vote in such a short period.

150.    In another letter dated January 24, 2019 (Exhibit C), plaintiff Gordon wrote the Board for a second time, reasonably and in good faith requesting that the Board provide plaintiff Gordon with backup documentation regarding its processes and conclusions, including the report and exhibits, as follows:

> [P]lease provide us the Ad Hoc Committee's report of its findings and recommendations to the Board together with all exhibits, interview notes, and all analyses regarding the independence of committee members.  Also, please provide us the minutes and presentations from all Ad Hoc Committee meetings. In addition, please provide us the retainer agreement with Bergeson, LLP.  Lastly, please also provide us the underlying releases and any other documents evidencing the company's agreements with any executives referenced in your letter, including the separation agreement with Steve Sugarman, as well as all documents upon which the Board relied to determine whether such agreements are enforceable.

> Given all of these documents already have been gathered and are in your possession, we ask that you provide us all of these documents not later than close of business on Friday, February 1, 2019.

151.    By letter dated February 1, 2019, again written by defendant Sznewajs, Banc refused in a one-liner letter to provide plaintiff Gordon any of the documents sought in his January 24, 2019 letter.  Exhibit D.

152.    Defendant Sznewajs's letter stating that information underlying the investigation would be hidden from plaintiff Gordon further confirms that the Board

did not engage in a reasonable, good faith investigation of the Demand.  Defendant Sznewajs provided no basis for refusing to provide any of the documents requested, and there is no reason for Banc to withhold the evidence now.

153.  Defendant Sznewajs's Rejection Letter and refusal to share information only serve to expose the fatally flawed process used by the Board in responding to the Gordon Demand.  These developments confirm that from the outset, the "Ad Hoc" Committee's hands were tied by a Board majority, and the outcome of the "Ad Hoc" Committee's investigation (including absolving all defendants of wrongdoing) was preordained.

### B.  Plaintiff Johnston's Demand

154.  On May 22, 2018, plaintiff Johnston's counsel sent a Demand to the Board, detailing the wrongdoing described herein, and demanding that the Board investigate and bring claims arising from the wrongdoing against those fiduciaries responsible for damaging the Company, including certain of the Company's current and former officers and directors (the "Johnston Demand").  Exhibit E.  The Johnston Demand also demanded that Banc institute certain corporate governance reforms.

155.  Plaintiff Johnston received a response from counsel for the Company, Mark R. McDonald ("McDonald") of Morrison & Foerster LLP ("Morrison & Foerster"), the same counsel that represented a number of the defendants in the pending securities class action.  Exhibit F.  McDonald stated that Banc was evaluating the Johnston Demand and requested documentation demonstrating plaintiff Johnston's proof of ownership of Banc of stock during the relevant period, which Johnston promptly provided.  Exhibit G.

156.  On July 5, 2018, counsel for the Company wrote to plaintiff Johnston advising that it recently received another litigation demand letter and that this letter would be considered at the same time as the Johnston Demand and a previously unreferenced litigation demand, "[b]ecause of the overlap between the allegations

raised in the three demand letters."  Exhibit H.  Plaintiff Johnston e-mailed counsel in response that same day asking for a copy of the other two litigation demand letters.  McDonald never responded.

157.   On August 27, 2018, plaintiff Johnston's counsel received a letter from the Company's in-house counsel, Angelee J. Harris ("Harris"), stating that "Banc of California, Inc. … is considering [the Johnston Demand]."  Notably, Harris stated that the Company, not the Board, was considering the Johnston Demand.  Exhibit I.

158.   Plaintiff Johnston responded to Harris on September 5, 2018, through his counsel.  He noted that he was previously contacted by the Company's outside counsel and asked whether to direct future conversation to the outside counsel or Harris.   Plaintiff Johnston also asked whether the Board had retained its own independent counsel.  Finally, Johnston noted that he never received a response to his request on July 5, 2018, for copies of the other outstanding litigation demand letters. Harris never responded to plaintiff Johnston's September 5, 2018 letter. Exhibit J.

159.   On October 9, 2018, plaintiff Johnston's counsel received an e-mail from yet another counsel, John D. Pernick ("Pernick") of the law firm Bergeson. Pernick stated that Banc was considering Johnston's Demand and that Pernick was retained to assist in this consideration.  Notably, yet again, counsel presented it as the Company, not the Board or a committee of the Board, as considering the Johnston Demand.  Exhibit K.

160.   Plaintiff Johnston responded that same day, highlighting that: (a) he had not received a response to his previous requests to review copies of the other litigation demand letters; (b) the Johnston Demand was sent to the Board, not the Company, and it was members of the Board that needed to consider the Johnston Demand; and (c) nearly five months had passed since the Johnston Demand had been made.  *Id.*

161.   Pernick responded by e-mail that same day.  In contrast to his earlier statement about assisting the Company in its consideration of the Johnston Demand, Pernick claimed that he was engaged by "the Special Committee of the Board of Directors of the Banc."  This was the first time any of the various lawyers that corresponded with plaintiff Johnston mentioned a "Special Committee" of the Board.  Pernick also asked why plaintiff Johnston was interested in reviewing the other litigation demand letters and whether his counsel was available for a call.  *Id.*

162.   Plaintiff Johnston explained in response that he was consistently told that the other demands were related to his, without any description of whether the demands focused on the same issues and facts.  He also requested that counsel inform him of the identities of the members of the "Special Committee."  Counsel's response to Johnston's requests was merely that he would "get back to [Johnston] with respect to your other requests."  *Id.*

163.   Plaintiff Johnston responded with his significant concerns about the claimed investigation of the Johnston Demand. In particular, after five months of counsel ignoring Plaintiff Johnston's letters and e-mails, he was suddenly told it was imperative that counsel speak with him immediately. In addition, counsel refused to provide even basic information about the newly constructed "Special Committee," including even the names of the members of the purported committee. Plaintiff Johnston also explained that he currently had no idea of the scope of the "Special Committee's" duties.  *Id.*

164.   Accordingly, plaintiff Johnston requested that counsel provide the Board minutes and resolutions creating the "Special Committee," appointing the members of the "Special Committee," and delineating the scope of the investigation of the "Special Committee."  In light of the above-described stonewalling and the supposed "investigations" that had previously occurred, allegedly, at least initially, overseen by the Board, this information was needed to show whether the Board was engaging in a good faith review of the Johnston Demand.   Plaintiff Johnston

1  explained that he would wait until review of the information before scheduling the
2  call.

3      165.   Pernick wrote back ignoring plaintiff Johnston's requests.   Plaintiff
4  Johnston responded again explaining how he has consistently provided whatever
5  information the Company requested while the Company's various counsel ignored
6  his overtures, a pattern continued by Pernick.   Plaintiff Johnston's response stated:
7  "In light of this refusal to act cooperatively, we fail to [see] how your request to talk
8  could be a good faith attempt to find information about an investigation that we
9  cannot even tell the special committee is appropriately empowered to investigate."
10 *Id.*

11     166.   Plaintiff Johnston did not receive a response to his e-mail.   He never
12 received copies of the other litigation demand letters that the "Special Committee"
13 considered at the same time as the Johnston Demand.   He also never received copies
14 of the minutes of the Board or other authorization of the Special Committee.   In
15 fact, plaintiff Johnston heard nothing about the Johnston Demand until January 4,
16 2019.

17     167.   On that day, plaintiff Johnston received a letter from defendant
18 Sznewajs, writing as Chairman of the Board, on Company letterhead, rejecting the
19 Johnston Demand.   Exhibit L.   In contrast to the previous claims, explicit and
20 implied, that there was a duly formed "Special Committee" investigating the
21 Johnston Demand, defendant Sznewajs stated that the Board formed an "Ad Hoc"
22 Committee, consisting of Kirk Wycoff, Mary Curran, and Bonnie Hill.   The
23 Rejection Letter did not provide any details on the formulation of this "Ad Hoc"
24 Committee, such as why these particular members of the Board were selected to
25 serve on it, what steps were taken to ensure that there were no improper conflicts,
26 and what powers the Board imbued this "Ad Hoc" Committee.

27     168.   The Rejection Letter did state that the "Ad Hoc" Committee's
28 investigation took ten weeks.   The "Ad Hoc" Committee presented its findings to

the Board on November 20, 2018.  Assuming the investigation ended somewhat contemporaneous with this presentation, this means that the Board sat on the Johnston Demand for nearly four months before investigating it.  *Id.*

169.  The Rejection Letter stated that the "Ad Hoc" Committee hired Bergeson to assist in its investigation.  Bergeson, however, previously identified itself as assisting the Company in an investigation in the Johnston Demand.  It is the same law firm that refused to provide any information about the "Special Committee," that was really an "Ad Hoc" Committee.  *Id.*

170.  The Rejection Letter stated that the "Ad Hoc" Committee presented its findings and recommendation to the full Board in a written report and that the Board adopted the report and recommendation of the "Ad Hoc" Committee.  *Id.*

171.  The Rejection Letter was notable in its lack of detail.  As further alleged herein, concerning the investigation, the Rejection Letter fails to detail which witnesses were interviewed with any specificity, nor what documents the "Ad Hoc" Committee reviewed.  It also failed to describe what role management and its counsel played in the review of the Johnston Demand, a particularly salient question in light of plaintiff Johnston having to deal repeatedly with counsel that claimed to represent or assist "Banc," not the Board, in the investigation.

172.  The Rejection Letter provided no information concerning key facts underlying the merits of its decision, such as who was responsible for the October 18, 2016 press release that falsely claimed that the Board oversaw the initial flawed investigation of the Galanis relationships.

173.  On February 25, 2019, plaintiff Johnston sent a letter to the Company demanding to inspect certain books and records related to the Rejection Letter. Exhibit M.  In particular, Plaintiff Johnston demanded to inspect:

- "All meeting minutes of the Board or committee of the Board tasked with reviewing our client's litigation demand (the

"Review Committee") where our client's litigation demand was discussed or evaluated."

- "All meeting minutes of the Board or Review Committee concerning the potential appointment of a special committee tasked with investigating the allegations raised in our client's litigation demand."

- "Any written report or presentation to the Board or Review Committee concerning our client's litigation demand."

- "All documents reviewed or relied upon by the Board or Review Committee concerning our client's litigation demand."

- "The engagement letters of any experts retained by the Board or Review Committee concerning our client's litigation demand."

- "All documents concerning the steps the Board and Company have taken in response to the broader concerns raised by our client's litigation demand."

174. The Company refused to provide the documents demanded, stating that it had no legal obligation to do so, on March 20, 2019. Exhibit N.

175. On April 11, 2019, plaintiff Johnston responded to Banc's rejection of his inspection demand. In his letter, plaintiff Johnston explained that by the Company refusing to provide the demanded books and records, it amounted to an improper attempt to prevent scrutiny of the decision to reject the Johnston Demand, citing *City of Orlando Police Pension Fund v. Page*, 970 F. Supp. 2d 1022, 1030 (N.D. Cal. 2013). Plaintiff Johnston requested that the Company reconsider its position. Exhibit O.

176. Ignoring plaintiff Johnston's directly on point citation, on May 8, 2019, the Company reiterated its rejection. Exhibit P.

### C.    Plaintiff Witmer's Demand

177.    In light of the events described herein, on November 15, 2017, plaintiff Witmer sent a Demand to defendant Sznewajs, Banc's Chairman of the Board, demanding that Banc's Board investigate and take legal action against those responsible for the damages the Company has suffered and is certain to suffer because of the factual allegations at issue herein (the "Witmer Demand").  Exhibit Q.

178.    On December 4, 2017, plaintiff Witmer received a letter from McDonald at Morrison & Foerster on behalf of the Board, stating, "[w]e are evaluating your request and will respond in due course.  We expect that you will not initiate any litigation purportedly on behalf of the Company without further communication with us."  Exhibit R.

179.    The "further communication" arrived by way of a letter dated January 8, 2018.  Therein, McDonald at Morrison & Foerster informed plaintiff Witmer as follows: "As I'm sure you know, a purported shareholder derivative action was previously filed and is pending, and the Company has filed a motion to dismiss that action on the grounds among others that the shareholder failed to make a demand on the Company nor established that demand would have been futile.   The Company has determined that it would be inappropriate for the Company to assert claims directly while that purported shareholder derivative action is pending."  Exhibit S.

180.    On June 25, 2018, McDonald again wrote to plaintiff Witmer's counsel, now asserting that in light of the dismissal of the demand futility litigation referenced in his January 8, 2018 letter, the Board would move forward with an investigation regarding the matters asserted in the Witmer Demand.  Exhibit T.

181.    The next communication plaintiff Witmer's counsel received was a letter from defendant Sznewajs, Chairman of Banc's Board, dated January 4, 2019—the same essential Rejection Letter received by the other plaintiffs.  Therein,

defendant Sznewajs stated that "[a]fter due consideration, the Board has determined that it is not in the best interest of the Company to pursue the claims alleged in the Demand Letter."  The Rejection Letter stated that the Board formed the "Ad Hoc" Committee that, among other things, retained the law firm of Bergeson as its counsel to assist in its investigation of the allegations listed in the Witmer Demand, interviewed "multiple witnesses," and prepared a report.  Exhibit U.

182.   On February 8, 2019, plaintiff Witmer's counsel wrote back to defendant Sznewajs seeking additional details and documents surrounding the "Ad Hoc" Committee's investigation into the Witmer Demand.  Exhibit V.

183.   Specifically, plaintiff Witmer's counsel requested that Banc: (a) specify the date that Bergeson was retained to assist in the "Ad Hoc" Committee's investigation; (b) provide the Board's resolutions creating and authorizing the "Ad Hoc" Committee to perform its investigation; (c) provide a list of past engagements between Bergeson any entity affiliated with a current or former director of Banc; (d) identify the witnesses interviewed by the "Ad Hoc" Committee or any individuals who declined to be interviewed; and (5) provide a copy of the underlying report. *Id.*

184.   On February 22, 2019, plaintiff Witmer's counsel received a one sentence response from defendant Sznewajs: "[t]he Company declines to provide you the materials or information you have requested."  Exhibit W.

### D.    The Rejection Letter Reveals Fatally Flawed Process

185.   Each of plaintiffs Gordon, Johnston, and Witmer received the same or nearly identical Rejection Letter.  Based on the contents thereof, it is clear that the "Ad Hoc" Committee of the Board limited the scope of the investigation to protect defendants and did not undertake an investigation that complies with applicable law.

186.   <u>First</u>, the Board failed to establish that the "Ad Hoc" Committee retained competent, independent counsel to conduct the investigation.  Plaintiffs

requested the retainer agreement with Bergeson so as to ascertain its independence, the scope of its representation, and who was paying its bills.  The Board refused to provide this information.  Furthermore, Bergeson never extended an invitation to Plaintiffs' counsel to personally meet with the "Ad Hoc" Committee.  This is not indicative of a reasonable, good faith investigation.

187.  <u>Second</u>, while the Board claims that the "Ad Hoc" Committee produced a 54-page report with 53 exhibits upon which the Board relied, all Plaintiffs received is a conclusory letter authored by one of the primary targets of the investigation—defendant Sznewajs.  The "Ad Hoc" Committee's procedures, reasoning and conclusions, upon which the Board purportedly relied in voting down any claims, remain a mystery, except to the extent defendant Sznewajs (an interested party) summarized them in the Rejection Letter.

188.  <u>Third</u>, the Rejection Letter fails to respond to many of the specific issues identified in Plaintiffs' Demands, and instead repeats, over and again, the mantra that the "Ad Hoc" Committee found "no evidence" of wrongdoing.

189.  The Rejection Letter:

a.  Fails to elaborate on the Galanis relationships with others among the Board and management;

b.  Fails to elaborate on its conclusion that no disclosure regarding the Galanis relationships needed to be made;

c.  Fails to describe facts regarding the directors' individual roles in the misleading October 18, 2016 press release;

d.  Fails to address the directors' conduct in permitting Grosvenor's false statements about said press release on the October 19, 2016 earnings call and in the October 19, 2016 Form 8-K filing;

e.  Fails to analyze or quantify harm suffered by Banc as a result of the misleading October 18, 2016 press release;

f.    Fails to provide an analysis of Plaintiffs' proposed corporate governance improvements, while writing them off as unnecessary;

g.    Fails to describe what information was provided by the Joint Audit Committee to the auditor in connection with the alleged improper bonus accounting;

h.    Fails to discuss the alleged motive for the alleged improper bonus accounting, as described by former executives with alleged personal knowledge of the matter.

190.  <u>Fourth,</u> the Rejection Letter fails to identify what witnesses were interviewed by the "Ad Hoc" Committee, and whether such witnesses included directors, officers or employees with relevant knowledge.  Instead, it appears the "Ad Hoc" Committee only reviewed depositions of unidentified witnesses.

191.  <u>Fifth</u>, the Rejection Letter fails to identify with any specificity what documents the "Ad Hoc" Committee reviewed, and whether those documents were relevant to the specific issues raised in Plaintiffs' Demands.  Furthermore, the Rejection Letter states that the "Ad Hoc" Committee considered "reports and other documents from prior investigations" without describing these in any detail, who authored such "reports," what the purposes or conclusions of such investigations even were, and why it was appropriate for the "Ad Hoc" Committee to rely on them.

192.  <u>Sixth,</u> the Rejection Letter claims that the "Ad Hoc" Committee met seven times.  Plaintiffs requested minutes of the relevant meetings to ascertain information about these meetings, but defendant Sznewajs refused.

193.  In sum, the Rejection Letter provided only unsupported conclusions regarding the Board's procedure, and failed to provide Plaintiffs any meaningful factual analysis underlying the bases for its conclusions.  The Board's investigation in response to the Demands was unreasonably incomplete and, as a result, the Board did not act on an informed basis when it rejected the Demands.  The refusal therefore was not a valid exercise of business judgment.

194.   The Board did not conduct a sufficient investigation to inform itself whether the claims in the Demands had merit.  Contrary to the refusal's assertion that exculpation rights render the claims unworthy of pursuit, there is no exculpation defense where, as here, there is active and deliberate dishonesty, and the fiduciaries obtained improper benefits.

195.   The Rejection Letter shows the Board simply ignored, or failed to consider in good faith, the strong evidence demonstrating the merits and probability of success of the claims against the Individual Defendants.

196.   Nor did the Board evaluate whether it would be in Banc's interests to seek compensation for any of the Individual Defendants' non-exculpable breaches of the duty of loyalty in light of the chances of success compared to the potential damages recoverable.  It does not appear that any of the Individual Defendants would be judgment-proof or lacking in assets sufficient to fund a reasonable settlement of claims or a judgment.  A potential recovery could offset Banc's substantial damages.

197.   The Board's failure to empower a true independent committee to actually exercise the Board's authority, conduct a reasonable investigation, properly evaluate the merits, apply correct legal standards, evaluate chances for a recovery, potential amounts recoverable, or even provide to Plaintiffs a report documenting its supposed investigation cannot be deemed a valid exercise of business judgment entitled to any presumption of reasonableness and good faith under law.

198.   No legal action has been filed by Banc against any of the Individual Defendants.   The primary architects of the scandal detailed herein have been allowed to remain, resign or retire.

199.   Accordingly, Plaintiffs' institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

200.   Plaintiffs have not made any demand on the other shareholders of Banc to institute this action since such demand would be a futile and useless act for at

least the following reasons: (a) Banc is a publicly held company with over 50 million shares outstanding and thousands of shareholders; (b) making demand on such a number of shareholders would be impossible for Plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders; and (c) making demand on all shareholders would force Plaintiffs to incur excessive expenses, assuming all shareholders could be individually identified.

## CLAIMS FOR RELIEF

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

201.   Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

202.   The Individual Defendants, by reason of their positions as officers and directors, and because of their ability to control the business and corporate affairs of Banc, owed to Banc an obligation to act in good faith, in a manner reasonably believed to be in the best interest of Banc, and with the ordinary care and candor that a prudent person would use in similar circumstances.

203.   The Individual Defendants acted in breach of their fiduciary duties.

204.   The Individual Defendants acted with active and deliberate dishonesty in making, or causing Banc to make, false and misleading statements to shareholders, the market and the SEC in filings regarding Banc's business and operations.

205.   The Individual Defendants received improper benefits, including substantial compensation, their continued access thereto and their continued positions, as a result of their breaches of fiduciary duty.

206.   The misconduct of the Individual Defendants is not exculpated under Maryland or other applicable law.

207.   As a direct and proximate result of these breaches, Banc has sustained significant damages.

208.   As a result of the misconduct alleged herein, these Defendants are liable to the Company.

**COUNT II**

**Against the Individual Defendants for Unjust Enrichment**

209.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

210.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Banc.

211.   The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Banc.

212.   Plaintiffs, as shareholders and representatives of Banc, seek restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

213.   Plaintiffs, on behalf of Banc, have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of Banc, demand judgment as follows:

A.   Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' misconduct and breaches of fiduciary duties;

B.   Directing Banc to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Banc and its shareholders from a repeat of the damaging events described herein, including, but not limited to, adopting corporate governance policies to: (a) strengthen the Company's controls over disclosure and financial reporting; (b) strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the

Board; (c) strengthen Banc oversight of its disclosure procedures; and (d) prevent or undo self-dealing and related party transactions;

C.     Determining and awarding Banc the damages it sustained as a result of the violations set forth above and restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.     Granting extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder;

E.     Determining and awarding Banc the damages sustained by it as a result of the Individual Defendants' breaches of fiduciary duties, as set forth above, from each of the Individual Defendants, jointly and severally, together with interest thereon; and

F.     Awarding Plaintiffs the costs and disbursements of this action, including reasonable fees and costs to Plaintiffs' attorneys, accountants, and experts.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: November 22, 2019          By: */s/ Ashley R. Rifkin*
                                  BRIAN J. ROBBINS (S.B.N. 190264)
                                  CRAIG W. SMITH (S.B.N. 164886)
                                  ASHLEY R. RIFKIN (S.B.N. 246602)
                                  JONATHAN D. BOBAK (S.B.N. 312374)
                                  ROBBINS LLP
                                  5040 Shoreham Place
                                  San Diego, CA 92122
                                  Telephone: (619) 525-3990
                                  Facsimile:  (619) 525-3991
                                  E-mail: brobbins@robbinsllp.com
                                          csmith@robbinsllp.com
                                          arifkin@robbinsllp.com
                                          jbobak@robbinsllp.com

ROBERT C. SCHUBERT (S.B.N. 62684)
WILLEM F. JONCKHEER (S.B.N. 178748)
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone:   (415) 788-4220
Facsimile:    (415) 788-0161
E-mail: rschubert@sjk.law
            wjonckheer@sjk.law

*Co-Lead Counsel for Plaintiffs*

COREY D. HOLZER (pro hac vice to be filed)
MARSHALL P. DEES (pro hac vice to be filed)
HOLZER & HOLZER
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Telephone:   (770) 392-0090
Facsimile:    (770) 392-0029
E-mail: cholzer@holzerlaw.com
            mdees@holzerlaw.com

ROBERT B. WEISER(pro hac vice to be filed)
JAMES M. FICARO (pro hac vice to be filed)
THE WEISER LAW FIRM, P.C.
22 Cassatt Avenue
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:   (610) 408-8062
E-mail: rw@weiserlawfirm.com
            jmf@weiserlawfirm.com

DANIEL L. GERMAIN (S.B.N. 143334)
ROSMAN & GERMAIN LLP
16311 Ventura Blvd., Suite 1200
Encino, CA 91436-2152
Telephone:  (818) 788-0877
Facsimile:   (818) 788-0885
E-mail: germain@lalawyer.com

*Additional Counsel for Plaintiffs*

1384641

---

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
- 55 -

<u>VERIFICATION</u>

I, Kristopher Gordon, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Consolidated Shareholder Derivative Complaint.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: <u>11-20-19</u>

DocuSigned by:

24BE8A7E45D9499...

Kristopher Gordon

1410395

## VERIFICATION

I, Donald Johnston, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Consolidated Shareholder Derivative Complaint.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

**KEENAN GARVEY**
Notary Public, State of Ohio
My Commission Expires 10-23-2023

Dated: 11/21/19

DONALD JOHNSTON

## VERIFICATION

I, Colleen Witmer, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Consolidated Shareholder Derivative Complaint.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____

_____
COLLEEN WITMER

1410395

58